# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THANH VONG HOAI<br>2620 Poag Street,<br>Alexandria,Virginia  22303<br><br>and<br><br>JOHN D. HEMENWAY<br>4816 Rodman Street, NW<br>Washington, D.C. 20014<br><br>and<br><br>DAVID HEMENWAY<br>4813 Rodman Street, NW<br>Washington, D.C. 20014<br><br>       Plaintiffs,<br><br>v.<br><br>The SUPERIOR COURT of the<br>DISTRICT of COLUMBIA<br>500 Indiana Avenue, NW<br>Washington, D. C  20001<br><br>and<br><br>The DISTRICT OF COLUMBIA<br>COURT OF APPEALS<br>500 Indiana Avenue, NW<br>Washington, D. C  20001<br><br>and<br><br>THE PANEL OF JUDGES<br>OF THE DISTRICT OF COLUMBIA<br>COURT OF APPEALS in their<br>official capacity as setters of case<br>management policy in their decisions<br>en banc and as three judge panels<br><br>and | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO.  1:06-cv- 00210-RJL<br>)<br>)<br>)<br>)<br>)<br>)  <u>JURY TRIAL DEMANDED</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |



THE BOARD OF JUDGES OF
THE DISTRICT OF COLUMBIA
500 Indiana Avenue, NW
Washington, D. C. 20001

and

ERIC T. WASHINGTON, Chief Judge,
District of Columbia Court of Appeals,
in his official capacity as
setter of judicial policy and practice
for the District of Columbia
Court of Appeals,
500 Indiana Avenue, NW
Washington, D. C  20001

and

HERBERT B. DIXON, JR.
Judge, Superior Court
of the District of Columbia,
in his official capacity as judge to whom
the case at issue is presently  assigned,
500 Indiana Avenue, NW
Washington, D. C  20001

       Defendants.

# FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR MONETARY DAMAGES, COSTS AND FEES
**(Filed as a matter of right, no responsive pleading having been filed.)**

## I.

### JURISDICTION

1.   Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to vindicate rights secured

by the First, Fifth and Seventh Amendments to the Constitution of the United States, and also

upon 42 U.S.C. § 1981, and the common law and the law of the District of Columbia.

2.   This Court has jurisdiction over the causes of action set forth in this complaint under 28 U.S.C. §§ 1331, 1337 and 1343 as well as 42 U.S.C. 1343 and 1341.  Appropriate declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has jurisdiction to enforce its own rulings, once made, when municipal courts refuse to apply them and make decisions in defiance of them.  That is particularly so when, as here, a plan of litigation has been put in place under which claims will be split and certain claims tried first in this Court and then municipal courts such as those of the District of Columbia refuse not only to apply the rulings of this court, but refuse to follow the plan to split the claims which the trial level municipal court imposed upon the case and refuse to allow the claims that the litigants were told could be tried in the municipal court to be tried after the federal claims were split out and tried in the federal court.

3.   This Court has venue over the causes of action herein under 28 U.S.C. § 1391.

## II.

## INTRODUCTION: D. C. COURTS SUED AS MUNICIPAL AGENCIES FOR POLICIES , PRACTICES AND CUSTOMS

4.      The gravamen of the case pursuant to 42 U.S.C. § 1983 is the deprivation of the rights of these plaintiffs by the municipal courts of the municipality of the District of Columbia through administrative and judicial practices, policies and customs of the courts of the District of Columbia, which, even where pronounced by judges or judicial panels, are decisions of policy in the administration of cases rather than decisions of straight substantive law.

5.      The relief sought is declaratory and injunctive in connection with litigation in the trial level court of the District of Columbia, the Superior Court, and as that litigation has been appealed on interlocutory appeal to the District of Columbia Court of Appeals.

6.      Both of the said courts are agencies of the District of Columbia as a municipality for purposes of this action to the extent that it is brought pursuant to 42 U.S.C. § 1983.  That is so as set out in decisions of this Court, beginning with such decisions as *O'Callaghan v. District of Columbia*, 241 F. Supp. 273 (D.D.C. 1990), *Best v. District of Columbia*, 743 F. Supp. 44

3

(D.D.C. 1990), and *Galloway v. The Superior Court of the District of Columbia*, 816 F. Supp. 12

(D.D.C. 1993) and decisions also of the United States Court of Appeals for this circuit such as

*Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000), which decisions followed the

decision of the U. S. Supreme Court in *Monell v .New York City Dept. of Social Services,* 436

U.S. 658 (1978) as that case overturned the decision in *Monroe v. Pape*, 365 U.S. 167 (1961).

### III.

### THE OUTLINE OF THE OFFENSES CHARGED

7.      In 1986, before the law alluded to above had emerged, the present plaintiffs

became embroiled in litigation in the Superior Court of the District of Columbia, CA 7075-86,

when they were sued in that court and eventually filed counter and third-party claims.

8.      Within the past year, despite many efforts over many years by these plaintiffs to

advance their defenses, and many efforts by these plaintiffs to have the 1986 suit filed against

them dismissed as being without any basis and in violation of a settlement agreement; and, later,

efforts by these plaintiffs to have the rulings of this Court applied to that suit against them so that

it must be dismissed, and despite the many efforts of these plaintiffs to advance their counter and

third-party claims, a judge of the Superior Court, the defendant the Honorable Herbert B. Dixon,

Jr., has threatened to dismiss their case without letting anything be ruled upon or heard, in direct

violation of their rights of due process, their right to petition for the redress of their grievances in

the local court, and their right to a trial by jury.

9.      This effort of this Superior Court judge to dismiss the claims and defenses of

these plaintiffs altogether without allowing the merits of those claims and defenses to be reached

is but one of a series of violations of the federal rights of these plaintiffs over a period of some

twenty years, and also is part a pattern that has now emerged of racial bias in violation of 42

U.S.C. §1981 inasmuch as it has now become clear that these plaintiffs, an ethnic Vietnamese-

American and two non-Vietnamese Americans who came to his assistance when he was

beleaguered, and were sued on false pretenses for doing so, will not be granted the rights to

proceed in the courts of the District of Columbia to pursue their claims because, as opposed to

granting rights to a non-Vietnamese entity embroiled in the case, whose claims and filings are

acted upon with alacrity, these plaintiffs will have their claims ignored because they basically

involve justification of the rights of one Vietnamese against other Vietnamese.

      10.     These plaintiffs now sue in this Court to enjoin these violations of their federal

rights and enjoin the municipal courts of the District of Columbia to allow their litigation to

proceed, granting them due process, their right to proceed to redress their grievances, to have

those issues where there is legitimate factual contention to be tried to a jury and to cease the racial

bias against a Vietnamese man and those helping him, namely the three plaintiffs herein,  in

obtaining the benefits of the justice system of the District of Columbia so that they too may have

the benefits of the American system of justice just as litigants do who are neither Vietnamese nor

aiding Vietnamese who seek justice.

## IV.

**A JUDGE OF THE SUPERIOR COURT IMPOSES A "CLAIM SPLITTING"
PLAN UPON THE LITIGATION, BUT, AFTER THIS COURT PARTICIPATES
IN THE PLAN, AND THESE PLAINTIFFS FOLLOW THE PLAN AS IMPOSED,
THE SUPERIOR COURT REFUSES TO FOLLOW THE PLAN, VIOLATING
THE RIGHTS OF THESE PLAINTIFFS IN DOING SO: INJUNCTIVE RELIEF
SOUGHT**

      11.     These plaintiffs allege, and it is central to their complaint, that the Superior

Court, through the Superior Court judge, the Honorable Frederick H. Weisberg, imposed upon the

case a plan under which the federal claims presented by these plaintiffs in their counter and third-

party claims would be split, and these plaintiffs would try their federal claims in the federal

courts, and in this one in particular, and then would return to the Superior Court and try the

remainder of their claims there.

      12.     In accordance with this plan imposed by the Honorable Frederick H. Weisberg of

the Superior Court, the litigation in the Superior Court was stayed.  The plaintiffs brought two of

their claims in this court.  Another federal claim had been brought by one of the plaintiffs herein, Thanh Vong Hoai, in the United States District Court for the Eastern District of Virginia, Alexandria Division under RICO.

13.    After these present plaintiffs concluded the two actions that were split out from their Superior Court claims, non-RICO claims, and brought in this Court pursuant to the plan imposed upon the litigation by the Superior Court of the District of Columbia, however, and, upon the motion of these plaintiffs, the stay in the Superior Court was lifted.  The Superior Court, in the person of the defendant the Honorable Herbert B. Dixon, Jr. then refused to apply the rulings of this Court as *res judicatea*.  In doing so, the Superior Court of the District of Columbia refused to follow the plan that it had imposed upon the case, and, in direct contravention of the plan that it had induced these plaintiffs and this Court to follow and instead held that these plaintiffs had lost the claims that the plan called for these plaintiffs to return to the Superior Court and pursue by not bringing those claims in this Court.  Thus the D.C. courts effectively misled these plaintiffs and, having induced this Court to follow the plan, ignored the findings of this Court.

14.    These plaintiffs now seek to enforce the *res judicatae* of this Court's rulings and to have this Court compel by injunction the cessation of this refusal by the D.C. municipal courts to impose the *res judicatae* of the rulings in this Court and to impose upon the Superior Court the plan of the subject litigation which the Superior Court itself, through one of its own judges, imposed upon the subject litigation and make the Superior Court follow its own plan, this Court having already followed that plan and issued rulings which the Superior Court must now heed.

## V.

## ONE POLICY VIOLATING THE RIGHTS OF THESE PLAINTIFFS

15. Among the policies of the D. C. courts violating the federal rights of these plaintiffs is a policy that dramatically changed from one not violative of the rights of litigants to one violating the rights of litigants *per se*.

16. In 1910, Mr. Justice Oliver Wendell Holmes, writing for the Supreme Court of the United States, in *King v. West Virginia,* 216 U.S. 92, 100, 101, 30 S. Ct. 225, 54 L. Ed. 396, pointed out that what is known law of the case is a "practice of the courts" and that it is determined in each state by the highest court of that state. In 1912, two years later, he repeated this finding in *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S. Ct. 739, 56 L. Ed. 1152, In both cases he also cited a number of earlier Supreme Court cases for this proposition.

17. This holding, that law of the case is a practice of the courts, not a limit upon their power, and thus a matter of policy to be set by the highest court of a jurisdiction, was specifically recognized in the District of Columbia in cases. See *Morse v. Morse*, 213 A.2d 581, 583 (D.C. 1965), and the old case of *Davis v. Davis*, 96 F.2d 512, 68 U.S.App.D.C. 240, 243 (D.C. Cir. 1938).

18. The court has power, under some circumstances, to disregard a prior decision, although it should not be exercised, except in a clear case (*Williams v. Order of Commercial Travelers*, 6 Cir., 41 F.2d 745), where the earlier adjudication was plainly wrong (*Seagraves v. Wallace*, 5 Cir., 69 F.2d 163, 165; *Rogers v. Chicago, R. I. & P. Ry.*, 8 Cir., 39 F.2d 601, 604), and where the application of the "law of the case" rule would work manifest injustice. *Zurich General Accident & Liability Ins. Co. v. O'Keefe,* 8 Cir. 64 F.2d 768, 770; *Johnson v. Cadillac Motor Car Co.*, 2 Cir., 261 F. 878, 886, 8 A.L.R. 1023. Cf. *United States v. Moser*, 266 U.S. 236, 242, 45 S. Ct. 66, 67, 69 L. Ed. 262. Emphasis added. The D. C. municipal courts recognized that the weight of authority, which D. C. followed, was that law of the case did not rule where decisions are clearly wrong or where they work a manifest injustice.

19.     The courts of the District turned 180 degrees away from this policy and that change in judicial policy had a direct and detrimental effect upon these plaintiffs, leading to the violation of their federal rights of due process, their right to petition for the redress of their grievances in the courts, their right to have issues tried to a jury, and, ultimately to the exercise of bias against them because the present plaintiff Hoai was a Vietnamese seeking justice against other Vietnamese, a would-be ethnic mafia, who had badly wronged him and who wronged the other two present plaintiffs because they sought to help him in his travails.

20.     This change in judicial policy began with cases by the defendant D. C. Court of Appeals such as *Kritsidimis v. Sheskin*, 411 A. 2d 370 (D.C. 1980) and by the time of the litigation in question had hardened into a different policy.  Under this new policy the doctrine of vacating or reversing decisions that worked a manifest injustice was dropped altogether.  Further, the concept of vacating or undoing decisions that were clearly wrong was modified into a position that decisions would only be undone if they were clearly wrong <u>in light of newly presented evidence or intervening changes in substantive law.</u>

21.     Thus the official policy of the D. C. Courts had become a policy that a judge can do no wrong and cannot possibly have worked a manifest justice when, as here, decisions that are clearly wrong and work a manifest injustice, become final.

22.     In the present case the very first actions by judges resulted in orders that were clearly wrong and worked a manifest injustice.  These decisions were made final by actions that, though they were done in accordance with policies and practices of the Superior Court, were themselves violative of the federal rights of these plaintiffs as set out below.

23.     The course of the litigation since has in many ways been a dramatic carrying out of these flawed policies and practices of the D. C. courts.  The policy which says that a judge can do no wrong, in particular, by its very absolutist nature, leads to the violation of federal rights, as it did here.

24.     This last flawed policy particularly violated the rights of these plaintiffs as it
interacted with, in this case, the refusal of the D. C. judges to compel any adherence to the plan of
the case whereby the claims of these plaintiffs in the case were split between the D. C. courts and
this Court.   Thus, the defendants protected themselves against correcting clearly wrong actions
by D. C. judges by violating that plan after this Court had issued rulings that made clear how
clearly wrong those actions were. Thus, the D. C. courts chose not to correct manifest injustice
that had been worked by those clearly wrong decisions, something the said courts would have
been required to do had they applied the rulings in this Court..

## VI.

## SOME FACTUAL BACKGROUND

25.     The present plaintiffs are an American of Vietnamese ethnicity and racial origin
and two Caucasian Americans who tried to assist him when his valuable service station franchise
in the District of Columbia was taken over by a group of other Vietnamese who told him that they
aspired to be like the Mafia and who used mafia-style tactics, as they perceived them, in taking
over the service station franchise through threats, deceit and intimidation, including threats of
death,

26.     This was part of the scheme of this would-be ethnic mafia in which they also
lured the Vietnamese-American plaintiff Thanh Vong Hoai into sinking his capital into a food
stall business and then took over that enterprise with threats of violence, seizing its inventory.
The plaintiff Hoai's investment was, for him, considerable capital.

27.     While luring the plaintiff Hoai's capital into the food stall business, these same
individuals induced him to accept a sham loan for the start up of the service station franchise with
Sunoco.  The loan never existed, but the false representation that it did enabled one of the
ringleaders of the Vietnamese ethnic would-be mafia, one Thanh Van Vo, to work his way into
physical control of the Sunoco station and franchise on Pennsylvania Avenue, SE, in the District

of Columbia by a combination of false representations and threats of murder and physical violence, threats that were at first hidden from Sun but then became known to its officials.

28.    The nature of this mafia style activity as it became evident is what made the flawed early decisions in the Superior Court so manifestly unjust and clearly wrong.   Their true nature was alleged from the outset by these plaintiffs in the Superior Court proceedings and yet by their flawed decisions judges of the Superior Court sided repeatedly with this would-be mafia. These decisions were not only flawed, but outside the role of judges altogether in certain respects. Then those decisions were repeatedly protected by further flawed decisions.

29.    Thanh Van Vo and the other members of this would-be Vietnamese ethnic mafia that was oppressing the present plaintiff Thanh Vong Hoai ultimately became counter and third-party defendants in the Superior Court of the District of Columbia case in question, when, with Thanh Van Vo as one of the ringleaders, the would-be ethnic mafia pursued this scheme to take over the two businesses from the plaintiff Thanh Vong Hoai  through a pattern of events which included threats of violence, even death, and a classic "mafia-style" "one dollar contract" forced upon the plaintiff Hoai by the intimidation with threats against Hoai and his family.

30.    By this "one dollar contract," Vo purported to buy the station and franchise, doing so in violation of the local Retail Service Station Act, (RSSA) and the franchise agreement between Hoai and Sun Refining & Marketing (Sun) as entered into under the Federal Petroleum Marketing Practices Act., (PMPA).  The actual laws by which Sun, at the time siding with its dealer, refused to accept Vo as a potential transferee of the franchise, were paid no attention to by the aspiring ethnic mafiosi when the would-be ethnic mafia took over the station by their mob tactics. Their ignoring of these controlling laws was later adopted as a policy by the Superior Court of the District of Columbia and its judges.

31.    During this time, Sunoco through its representatives, rejected all attempts by Thanh Van Vo to become a transferee of the franchise.

32.    The defendant courts and their judges, by the practices, policies and customs complained of in this suit, blessed and sanctioned this ignoring of the laws and also ignored the laws until the present plaintiff Hoai, at the instance of the Superior Court judge, the Honorable Frederick H. Weisberg, came to this Court and successfully pursued a claim here under the federal Petroleum Marketing Practices Act (PMPA) 15 U.S.C. § 1601 *et seq.* But even after the law had been made clear in this Court and the United States Court of Appeals in this circuit, the defendant courts of the District of Columbia have refused to apply the law and have not changed their course.  Now they seek to dump the case in order not to have to apply the law as ruled by this Court and set out in statutes or enabled by statutes and contract law.

## VII.

## THE PARTIES

33.    The plaintiff Thanh Vong Hoai is a resident of Northern Virginia who, at the times pertinent to the litigation at issue in the Superior Court of the District of Columbia and the Court of Appeals of the District of Columbia owned and operated a Sunoco franchise on Pennsylvania Avenue, SE, in the District of Columbia.  Simultaneously, he operated, and was fraudulently led to believe that he was purchasing, an ethnic food business in Arlington County, Virginia.  In the case at issue in the D. C. courts, he was sued and then became a counter-plaintiff and third-party plaintiff in addition to being a defendant.

34.    The plaintiff John D. Hemenway is a resident of the District of Columbia and member of its bar who attempted to assist the plaintiff Thanh Vong Hoai in protecting his business enterprises:  the gas station franchise in the District of Columbia and the food business located in Arlington, Virginia, when the third party defendants other than Sunoco initially attempted to take them away from the plaintiff Hoai.  In the case at issue in the D. C. courts, he was sued and then became a counter-plaintiff and third-party plaintiff as well as a defendant.

11

35.    The plaintiff David Hemenway is a resident of the District of Columbia who attempted to assist the plaintiff Thanh Vong Hoai in protecting his business enterprises:  the gas station franchise in the District of Columbia and the food business located in Arlington, Virginia, when the third party defendants other than Sunoco initially attempted to take them away from the plaintiff Hoai.  In the case at issue in the D. C. courts, he was sued and then became a counter-plaintiff and third-party plaintiff as well as a defendant.

36.    The defendant the Honorable Herbert B. Dixon, Jr., is a judge of the Superior Court of the District of Columbia, the municipal court in which the case at issue is presently pending and is the judge to whom the case is presently assigned.

37.    The defendant Superior Court is the trial level court of the District of Columbia, and as such is the court of a municipality under the decisions of the courts.

38.    The defendant District of Columbia Court of Appeals is the appellate court of the District of Columbia as a municipality for purposes of the statutes sued under.

39.    The defendant Board of Judges of the District of Columbia consists of the Chief Judge and all the Associate Judges of the District of Columbia Superior Court.  They are responsible for policies and practices of the Superior Court and for seeing that they are carried out and observed.

40.    The defendant Eric T. Washington is the Chief Judge of the District of Columbia Court of Appeals and, as such, in his official capacity, in which capacity he is sued, can decide upon and influence judicial policy such as that which is involved in litigation plans that allow claim splitting and their enforcement and in case management policy where there is application of law of the case doctrine or discriminatory treatment based on race or national origin or other such discretionary matters of judicial policy as opposed to application of the law as such.

41.    The defendant Panel of judges of the District of Columbia Court of Appeals is the body of judges of that Court addressed in their official capacity as they make decisions,

particularly those decisions that are not legal decisions as such but decisions about case treatment and management.

42.    For purposes of the Federal Civil Rights Statutes at issue here the defendant courts and court officers are courts and officers of a municipal government, that of the District of Columbia., a body duly constituted pursuant to the Constitution and acts of Congress.

## VIII.

## HOW THE LITIGATION IN THE D. C. COURTS STARTED

43.    After the would-be ethnic mafia took Hoai's station away from him by their mob-style tactics he retained a Vietnamese lawyer who agreed to meet with Hoai and the Sunoco area representative, Ernie Peele, but failed to show up for the meeting.  On information and belief the plaintiff Hoai believes that that lawyer was intimidated by the group that had taken over Hoai's businesses.

44.    Hoai then retained another Vietnamese lawyer, My-Linh Soland, who purported to be helping him but made matters worse by, among other things, promising to file in court and not doing so, and telling him to stay out of the station for fear of his safety when Sun was telling him he had to get back into the station in order to retain his franchise.

45.    Hoai found out that the lawyer My-Linh Soland in fact had long done work for two of the would-be Vietnamese mafia that were oppressing him, Minh and Luu.

46.    While in these straits the plaintiff Hoai happened to meet the plaintiff David Hemenway when Hoai's car had broken down by the side of the road and David Hemenway stopped to offer assistance.

47.    David Hemenway in turn introduced the plaintiff Hoai to his father, the plaintiff John D. Hemenway, a member of the D. C. bar.   David Hemenway asked John Hemenway if he could help Hoai in his distress.

48.     John D. Hemenway met with the plaintiff Hoai and the Sunoco Area Representative, Ernie Peele, who confirmed that Hoai was Sunoco's dealer and needed to get back into the station to save his franchise and operate it.

49.     Ernie Peele signed, as Sunoco Area Representative, a Notice to Surrender the Premises which John D. Hemenway drew up on behalf of the present plaintiff Hoai so that they could go to the station and see if those illegally occupying it would surrender peacefully without being taken to court.  The notice, signed by Peele, asserted that Hoai was the only legitimate franchisee of the station and its rightful occupant.

50.     On August 25, 1986, the two Hemenways and Haoi went to the station on Pennsylvania Avenue, SE, in the District of Columbia, and presented the Notice to Surrender and showed those who were there that it was signed by Peele, attesting that Hoai was the legitimate franchisee and occupant of the station.

51.     Thanh Van Vo was not there   A heavyset man who they later learned was a cousin of Vo's, Phuly Vo, was in the station with other Vietnamese and seemed to be in charge. Later they learned that Vo was in Toronto, Canada, at the time.

52.     Phuly Vo threatened these plaintiffs that he would call the police.  These plaintiffs encouraged him to do so and he did.  The police came and witnessed the rest of what happened.

53.     The police who came talked to John Hemenway and told him that he would have to go to court to formally evict those who were there.

54.     John Hemenway acknowledged that he knew that but he wanted the police to witness what happened if he just asked those there peacefully to leave, asserting what was in the notice.

55.     With the police as witnesses, present plaintiff John D. Hemenway presented his notice, informed all who would listen what was in the notice and asked them to leave.

56.     All the Vietnamese who had been hired by Vo left, some requesting and being allowed to take their possessions, including in some cases tools and in one case an automobile.

57.     They left without putting up any opposition or argument after the initial protestation by Phuly Vo.  The present plaintiffs cordoned off the station and began to prepare it to reopen under its restored proper franchisee's management.

58.     Early the following morning of August 26, 1986, the present plaintiffs Thanh Vong Hoai and David Hemenway were in the station.  At that time Thanh Van Vo (Vo), having hurriedly returned from Toronto, Canada, led a gang of eight or more Vietnamese which reentered the premises in a threatening manner, with one gang member brandishing a knife.

59.     The present plaintiffs Hoai and David Hemenway were forced, for fear of their lives, into retreating into the station building, locking it, and then the gang began to break into the building to get at plaintiffs Hoai and David Hemenway.   From inside Hoai and David Hemenway could hear members of the assaulting gang trying to break into the building through the roof and through the rear.

60.     David Hemenway called the 911 emergency police number, stating to the dispatcher that he and Hoai were under attack, and the police responded.

61.     The present plaintiff John D. Hemenway came to the station as did other parties on the side of Vo, including the lawyer for the would-be ethnic mafia, Michael Arif.  The confrontation de-escalated from one of physical assault to one of verbal confrontation.

62.     In that verbal ensuing confrontation involving additional parties from both sides it was agreed that the parties would meet the following day at the station in the presence of Ernie Peele, the Sun Area Representative, and abide by his decision as to who was the legitimate franchisee and occupant of the Sunoco station on Pennsylvania Avenue, SE, in the District of Columbia..

63.    The parties met on the following day, August 27, 1986, as agreed.  Earnest Peele, the Sunoco Area Representative, informed all who were present that Hoai, a plaintiff here, was Sun's dealer and the legitimate occupant of the station and owner of the franchise.

64.    John D. Hemenway openly tape recorded this encounter as he had portions of the encounter on the preceding day, once it had de-escalated.

65.    The would-be Vietnamese mafiosi, with their lawyer present, appeared to abide by the decision made by Ernie Peele and left the station except for their lawyer, Michael Arif, who purported to be taking an inventory of the goods and items purchased by Vo while he was in illegal control of the station for purposes of crediting him with the expenditures on those goods and items.

66.    Michael Arif was desultory in taking this inventory and after a while he claimed that some money was missing from a desk, declared that he had to go to a meeting, and left. What happened next made it clear that this inventory was a mere pretext and the missing money charge a fabrication.

67.    For, as Michael Arif was purporting to be abiding by the agreement between the parties by taking the inventory, the ringleader Vo went out and got other lawyers.  Within a day, Vo launched a pre-emptive strike lawsuit in the Superior Court against the plaintiffs herein, charging them with a number of fabricated common law offenses, such as assault, in effect accusing plaintiffs of the sort of behavior that Vo and his gang had engaged in.

68.    Vo sued in that case along with a second plaintiff, Suntech Inc., a company he had formed when he illegally took over physical control of the gas station franchise.

69.    Vo's complaint made no mention of, and avoided, the statutes and the law that govern service station franchises and unfulfilled conditions precedent to any transfer such as were clearly set out in the franchise contract between Hoai and Sun as enabled by the PMPA and are contained in the District of Columbia Retail Service Station Act (RSSA).

70.    This was so even though that franchise agreement between Sun and Hoai containing the precedent conditions was attached to the Vo/Suntech complaint.

71.    This complaint was drafted as if the PMPA, the RSSA, and the franchise agreement and their lawful requirements for the fulfillment of the precedent conditions requiring written notice and an opportunity for the franchisor to vet the proposed transferee did not exist. Nor did the Complaint take cognizance of the RSSA provision forbidding such suits against a franchisor.

72.    In essence the complaint asked the defendant Superior Court to enforce that which the law itself forbids.  The Complaint was originally filed August 28, 1986.

## IX.

## THE INVALIDITY OF THE VO COMPLAINT

73.    Although the complaint as filed by Vo and his company contained no request for injunctive relief, nonetheless, he and his company filed a motion for a Temporary Restraining Order when they filed their original complaint in the D. C. Superior Court.

74.    This suit was against the three present plaintiffs and also against Sunoco.

75.    Almost every charge in the original complaint is barred as a matter of law.

76.    None of the charges against Sunoco in the complaint can be brought in the face of the RSSA bar against proposed transferees of a franchise who are rejected by the franchisor suing the franchisor.

77.    Similarly, practically all of the counts against these three plaintiffs are unsustainable. They assume that the franchise belonged to Vo, and thus incorporate and depend upon charges that are unsustainable because the complaint incorporates the franchise agreement between Hoai and Sunoco, whose precedent conditions which are specifically allowed by the PMPA were clearly not met in that Sunoco specifically disapproved Vo as a transferee or owner

of the franchise. The complaint sought to have the Superior Court compel Sun and the plaintiff Hoai to do that which they correctly and lawfully did not do.

78.  Their theories were such things as breach of the one dollar extortionate contract, civil trespass, conversion, lost profits, and tortious interference with a business contract. At that time they sued not only the three plaintiffs in this litigation but also Sun as having allegedly participated in these enumerated torts, all of which assumed Vo owned the franchise, which, as already alleged, was impossible as a matter of law.

79.  The charges against John D. Hemenway for theft are based upon the pretextual assertion of the attorney Arif that money was missing made during the pretextual inventory, and are thus based upon the unsupportable notion that an accusation that something is missing in a situation where a person has been one of a number in the premises is a viable charge.

80.  The charge of assault against the present plaintiff David Hemenway is ludicrous. It is based upon David Hemenway's having ostensibly brandished an iron bar when he and Hoai, had locked themselves inside the station building, and were greatly outnumbered by a mob led by Vo. Yet, it was the plaintiff Vo making this ludicrous charge, who was trying to break into the building to do them harm, with one of the assailants openly flashing a knife. The bar was brandished from within the locked building that was under assault.

81.  The complaint did not make any allegation of the tort of wrongful eviction and if it had would have been subject on that count to the same infirmity outlined above as violative of controlling statutory law, the franchise agreement under the PMPA, and of the franchise being Hoai's as later found by this Court as well as other infirmities.

82.  Moreover, the complaint was brought in direct violation of the settlement agreement between the parties to abide by the word of Ernie Peele as to who was the legitimate owner of the franchise and occupant of the station.

## X.

## THE TRO HEARING AND THE INITIAL CLEARLY WRONG DECISION, ONE WHICH WORKED A MANIFEST INJUSTICE

83.     The TRO hearing as it first proceeded on the day of the filing of the complaint by Vo and his company, August 28, 1986, was a day in which the hearing was largely taken up by the TRO judge's disqualifying John D. Hemenway as attorney for the parties sued on the basis of the pretextual charges against him in the complaint.  Another attorney, D. Curtis Danielson, was finally obtained to represent the defendants but had not been at the hearing very long when the judge, the Honorable Annice M. Wagner, then an associate judge of the Superior Court, stopped the hearing and adjourned matters to the following day.

84.     The judge informed the parties that she had to go to a hairdresser's appointment, and that such appointments are difficult to get.  The attorney D. Curtis Danielson informed the court that he could not appear the next day because of a schedule conflict.

85.     Overnight the defendants obtained new counsel and the following day, when the TRO hearing resumed, as a matter of record, were represented by the present counsel for the three present plaintiffs.  Sunoco, subsequently, defected from its dealer Hoai, and made an agreement with the would-be mafia ringleader Vo to give him the franchise, as is set out more particularly below.  In the meantime the TRO hearing continued with the three present plaintiffs and Sun as defendants against whom the TRO was sought.

86.     When the TRO hearing resumed at 9:30 AM on August 29, 1986, the judge stepped outside of her judicial role and function and decided to act a prosecutor and advocate against these plaintiffs and Sun as the then named defendants in the lawsuit in question, introducing into the cause a tort not pled by the plaintiffs and insisting that these defendants and Sun be tried for it.

87.     She thus stepped outside her common law immunity and privilege as it protects her personally against violations of 42 U.S.C. § 1983 and acted where she had no jurisdiction at

all, as opposed to arguably making a questionable judgment where she did have some basic jurisdiction.

88.    It happened like this:

89.    The attorneys for Vo and Suntech presenting the case for the TRO had scarcely gotten out a few sentences of their case when the judge, the Honorable Judge Annice M. Wagner, interrupted and made it clear that she did not care about the torts that were pled; she wanted these plaintiffs and Sun, as the defendants at that point, prosecuted for the tort of "wrongful eviction." This was a tort that had not been pled and was thus not in the complaint which the TRO was in support of.

90.    Thus the judge stepped outside the role of jurist and took on the role of prosecutor and advocate in complete violation of the rights of these defendants, which she trampled upon egregiously.

91.    In doing this the Honorable Judge Annice M. Wagner ignored completely the laws governing gas station franchises in the District of Columbia such as the PMPA (as noted in this Court in the later PMPA case won by Hoai.) and the District of Columbia Retail Service Station Act (RSSA), both of which enable  or, in the latter case, statutorily mandate waiting periods before such transfers of service station franchises in order that the franchisor (Sun here) may check the background and experience as  well as the credit and financial status of the proposed transferee.

92.    Thanh Van Vo had no background and experience as an operator of service stations and did not even know how to check the oil in a car.  He had been examined and vetted by Sun and rejected as a potential transferee of the franchise.

93.    Thanh Van Vo had no credit and financial strength. In he and his colleague Thach were running a scam in which Thach falsely claimed to be president of a bank.  They falsely claimed to be lending the plaintiff Hoai $35,000.00 by putting it in an account for the

station.   In fact they "salted" the account with a very small amount of money, then forbade the

plaintiff Hoai access to it.  They then put the proceeds of the station into the account, while

writing bad checks on the account, including to the Superior Court for the TRO bond and to Sun

for gasoline deliveries.

94.    Nonetheless, all of this was ignored by the TRO judge in order that she might act

as a prosecutor and advocate, and insert into the case and prosecute  her  concept of "wrongful

eviction" which she knew of from her days in private practice as a "People's Counsel" enforcing

tenants' rights.

95.    This was not a landlord and tenant situation and hence, even by D.C. law the

concept of wrongful eviction did not apply for many other reasons, such as that Vo was an

intruding scrambler in Prosser's phrase.  He had no occupancy rights; he was trying to get the

Superior Court to give him such rights in the face of clear contractual and legal barriers against

them.  These defendants had no paramount title over Vo and he a subordinate title.  Sun was not

his landlord.

96.    During the hearing there was testimony from Ernie Peele, Sun Area

Representative, about the failure to meet precedent conditions by Vo and the talk by Vo and his

would-be Vietnamese mafia colleagues about "breaking legs" of Hoai.   The TRO judge ignored

these things, refused to consider the actual facts of the case or the controlling law and found the

equities to be for the would-be Vietnamese mafias. In fact she made no effort at all to consider the

harm that would come to the plaintiff Hoai from her decision to deprive him of his gas station

franchise based on her emotional decision to become a prosecutor in the cause.

97.    This was as clear a case of a decision that was clearly wrong and worked a

manifest injustice as could be found.  A judge of the Superior Court knowingly chose to side with

a would-be ethnic mafia against the legitimate owner of a major oil company franchisee, against

that oil company, and against two individuals who merely sought to assist that Vietnamese

franchisee against the would-be ethnic mafia that was oppressing him and one of its ringleaders, Vo.

98.    Since the TRO, all the energies of the defendant courts have been devoted to seeing that this clearly wrong and manifestly unjust decision is never examined so that the law may be applied to correct it and to prevent it from in any way being found to have been wrong, even when this Court had made rulings, as it subsequently did, that made it clear that this decision was wrong as a matter of *res judicatae.*  Still the judges of the D. C. courts applied their policy that no clearly wrong decision can be corrected, that even when, as here, a decision works such manifest injustice that it shows a judge giving aid and comfort to a would-be ethnic mafia.

## XI.

### ASSURING NO HEARING

101.    Rule 65 of the District of Columbia Rules of Civil Procedure is copied from Rule 65 of the Federal Rules of Civil Procedure and the case law under the Federal Rule applies to its Superior Court counterpart.

102.    The language of the TRO issued by the Honorable Annice M. Wagner in the Superior Court in the subject case is in accord with due process and the normal practice under Rule 65 inasmuch as it states that the TRO will expire in ten days.

103.    During the TRO hearing the Honorable Annice M. Wagner assured these plaintiffs, and the plaintiff Hoai in particular, that there would be a full preliminary injunction hearing within days.

104.    The TRO judge then changed her mind and suddenly decided that there would not be a preliminary injunction hearing, giving as her reason that the plaintiffs in that case, Vo and his company, had requested no injunctive relief in their complaint.

105.    Thus, what was a fault by the plaintiffs in that case was used to deprive the present plaintiffs, as defendants in that case, of normal due process in violation of the TRO itself, furthering the manifest injustice of the actions of the judge.

106.    The judges of the Superior Court then took further steps under their practices, policies and customs in that court to assure that these plaintiffs would have their rights violated and never reach the merits of their claims and defenses, depriving them of due process, the right to proceed to redress their grievances, to have their issues tried by jury, and ultimately assured that justice would be denied to a mere Vietnamese-American and those seeking to assist him.

107.    The defendant courts and those operating them made sure that there would be no hearing and, next, that there would be no security for these plaintiffs and thus that they would be deprived of their property and rights without just compensation.

# XII.

## A FURTHER PRACTICE DEPRIVING THESE PLAINTIFFS OF THEIR FEDERAL RIGHTS AND A FURTHER REFUSAL TO ADDRESS AND CORRECT

108.    In the TRO Order issued by the Honorable Annice M. Wagner at the end of the TRO hearing on August 29, 1986, a bond was set as a precedent condition for the TRO to go into effect as may be seen in the Order.

109.    The bond was set at $3,000.00, a completely inadequate amount for a major oil company gas station franchise as a matter of which this Court may take notice.  It was to be paid in cash by the terms of the TRO.

110.    No cash was ever paid, nor even an attorney's check, as promised at the end of the TRO hearing by counsel for those plaintiffs seeking the TRO.

111.    Instead the plaintiff Vo issued a check backed by insufficient funds on the account of the service station franchise that he had set up when he illegally took over the station from the present plaintiff Hoai by mob-style tactics.

112.     The bond was to be paid that day.  It was not in fact paid for that day or even the following business day.  In fact it was not actually paid for for weeks.

113.     This account upon which this check for the bond was written was the account into which he, the Superior Court plaintiff Vo, had falsely represented that the had put the capital "loan" to Hoai of anywhere from $35,000.00 to $50,000.00; in fact he had deposited, as the bank records show, only a few hundred dollars.

114.     Weeks later, the court notified the plaintiff Vo that his check had been returned for insufficient funds.

115.     Subsequent attempts by the present plaintiffs to inform the D. C. municipal judges that the TRO had never come into being because this precedent condition had not been fulfilled, and to have that court declare the TRO to have never come into being for failure to fulfill the precedent condition, were ignored and never acted upon.

116.     Ultimately, after the plaintiff Vo simply disappeared for many months, these plaintiffs asked that he be required to show cause why his case against them should not be dismissed or ruled upon as inadequate.   During that period, Vo's counsel had been allowed to withdraw, because he had not been paid the plaintiff Vo.  Vo reappeared and his counsel was allowed to represent him further, by the Court's having the bond paid to Vo's for his counsel fees, without any notice to these plaintiffs.  These plaintiffs' objections to paying Vo's counsel from the bond, and the reappearance of that counsel, were ignored.

117.     Thus, this error and mistake became part of which, though clearly wrong and manifestly unjust, the defendants to this day refuse to correct.

118.     The defendant Superior Court, its panel of judges, and the defendant Court of Appeals, with it supervisory responsibilities, have all been extremely negligent in never providing any remedy in Rules or in their practice for allowing those affected as defendants by the failure of plaintiffs who seek TRO's to meet the precedent condition of filing bonds within the time

specified with legitimate payment.  The result, is to continually deprive defendants of any

security as contemplated by the law and the Rules and, ultimately, as here, to deprive or

contribute to depriving defendants of property and rights without due process of law.

119.    The practice by the offices of the defendant Superior Court of not requiring

proper meeting of the precedent condition of timely filing bonds in proper form, as all those who

practice in the Superior Court know and have experienced, is common as an examination of the

records requiring the posting of the bonds over the years will show.

120.    Judges who issue TRO's, when notified of such failure to meet the precedent

condition of timely and properly filing bonds, routinely practice a policy of ignoring or excusing

such failures.

121.    These policies, practices, and customs were particularly harmful in the subject

case because of what happened next when, in a further violation of the rights of these plaintiffs,

the TRO was made *de facto*, into a permanent injunction without any notice to them, again in

gross violation of their federal rights.

## XIII.

## A FURTHER VIOLATION OF FEDERAL RIGHTS
## MAKES THE TRO PERMANENT

122.    By its terms, and also according to the Civil Rules of the defendant Superior

Court, which are copied from the Federal Rules, (including, in that copying, Rule 65,) the TRO

was to expire in 10 days.

123.    The Honorable Annice M. Wagner, during the TRO hearing, explained from the

bench to the present plaintiff Hoai, there a defendant, that he would have a chance to present his

case at a preliminary injunction hearing in just a few days.

124.    However, the Honorable Annice M. Wagner, decided, as the TRO hearing was

ending, (During the TRO hearing these plaintiffs had pointed out that Vo, as the plaintiff in that

proceeding, had not requested any injunctive relief,) to not set a preliminary injunction hearing,

despite her previous assurances that she would set such a hearing.  She did this despite the mandate of Rule 65, for the irrational reason, as she gave it, that the plaintiffs Vo and his company had not sought any injunctive relief in their complaint.

125.    In the meantime, as set out in the preceding subsection, the plaintiffs Vo and his company had not met the precedent condition of posting a bond in cash within the allotted time, or even with a valid and good counsel's check within the allotted time.  Instead Vo used a check drawn on the account of the franchise that he had illegally taken over, the same account in which he claimed falsely to have deposited the "loan" that never existed.

126.    As previously alleged also, by virtue of the Retail Service Station Act (RSSA) as in effect in the District of Columbia, Vo was specifically forbidden, as a disappointed proposed transferee of the franchise, from suing Sunoco.  See RSSA, D.C. Code § 10-226(b).

127.    All Sunoco had to do was to move to have itself dismissed, citing the RSSA, and even the Superior Court, having set itself in favor of Vo and the would-be Vietnamese mafia at that point, would have had no choice but to dismiss Sunoco from the case.  Further, the Federal PMPA specifically allows a franchisor such as Sun to impose the conditions precedent regarding transfer of one of its franchises in its franchise agreements, as it did in its franchise agreement with Hoai, conditions precedent that, as here, are in concordance with local law.  Sun had an absolute right to impose, as it did, precedent conditions of a time delay in which it had the right to vet any proposed transferee and reject that transferee on rational grounds, as it did with Vo. The Superior Court had no jurisdiction to entertain the suit by Vo against Sun as it did, the case being dismissible on its face.

128.    As it turned out, even when it later did get dismissed from the case as a defendant because it switched sides and gave the franchise to Vo, Sunoco, despite being a major oil company, did not cite the RSSA, never mentioned it and instead cited the fact that it had switched

sides and joined with what it knew was a would-be Vietnamese mafia as grounds for its dismissal, confirming its knowing collusion with thugs who were terrorizing its own dealer and franchisee.

129.    Further, Sun could have, in conjunction with the present plaintiff Hoai, invoked the precedent conditions in its actual franchise agreement with Hoai and simply pointed out that those conditions had not been met, and that it had vetted the plaintiff Vo and found him wanting with complete justification.

130.    The Federal Petroleum Marketing Practices Act specifically allows such precedent conditions in franchise agreements, particularly where, as they do here, they comport with local statutory law governing service station franchises. 15 U.S.C. § 2806(b).

131.    Instead of simply moving itself out of the case pursuant to the RSSA or its franchise agreement's terms as allowed and enabled by the PMPA, Sun chose to use and invoke a Rule of the Superior Court and its practices and procedures to switch sides, abandon its dealer, and give the franchise to the intruder Vo, an utterly needless act that was later found by this Court to be an illegal termination of the present plaintiff Hoai's franchise in violation of the PMPA.

132.    This action has needlessly cost Sunoco hundreds of thousands of dollars to date, in a judgment against it, a fee judgment against it under the PMPA and payments to its own counsel for years of needless litigation.  The bulk of the damages inflicted upon these plaintiffs as a result of this illegal act are still pending and unresolved, if the law is obeyed and the defendants are enjoined to observe the rights of these plaintiffs.

133.    In 1986, when Vo and his company Suntech launched their pre-emptive strike law suit in the defendant Superior Court of the District of Columbia in violation of their settlement agreement to abide by the word of Ernie Peele as to who was the dealer and franchisee owning the Sun franchise on Pennsylvania Avenue, SE, the defendant Superior Court had a Rule called the Judge-in-Chambers Rule, Rule 12-I (b).

134.    This Rule as it then stood gave the Judge-in-Chambers, as appointed by the Chief Judge of the Superior Court, unfettered power to decide which parties in a litigation would be required to appear and be notified in a particular litigation to enter an order.

135.    While the Rule as then in effect specified a list of particular decisions which the Judge-in-Chambers might make it also contained a broad and boundless provision that the Judge-in-Chambers might consider and decide upon "any and all matters appropriate for such disposition." It did not provide any standard for deciding what might be appropriate for such disposition.

136.    In particular the Rule did not provide for notice to all parties and their counsel in such situations as obtained in the subject case, and was thus negligent in its construction on its face and an invitation to abuse of such matters as the requirement for due process imposed upon the institutions of the District of Columbia under the Fifth Amendment to the Constitution of the United States.

137.    Under this Rule, and the practice and procedure under it in the Superior Court, any two or more parties to multi-party litigation could go to the Judge-in-Chambers without notifying any of the other parties to the controversy and agree among themselves how to dispose of property in controversy.

138.    That is what Vo and Sun did in this instance in 1986 as the end of ten days after the TRO had been issued approached, at which point, even had the TRO been legitimate with the bond paid as required, it would have expired by its own terms and the Rule.

139.    On its face this Rule and the practice and procedure under it violated the due process rights of these plaintiffs under the Fifth Amendment by allowing the taking of the service station franchise property from Hoai without notice to the parties affected, and with regard to all of these plaintiffs by depriving them *per se* of their rights of due process in the litigation

140.    It was completely negligent of the Superior Court to have such a rule and to allow such deprivations under it by the use of its blatant lack of proper requirements and protection for all parties.

141.    By 1990 the Superior Court changed the rule to make it apply only to specific items and situations and by eliminating the wide open language quoted and referred to above, but it was too late for these plaintiffs. The change in the Rule did acknowledge and show that the Rule was defective as alleged.

142.    In the subject case, without even notifying the other parties to the litigation, the parties Vo and Sun, enabled by the defective and violative Rule, could and did make a private agreement whereby Sun handed the franchise that was Hoai's over to the intruder Vo

143.    Because of this defective and violative Rule a judge of the defendant Superior Court, the Honorable Judge Stephen F. Eilperin, acting as Judge-in-Chambers, signed the Consent Order drawn up by the parties as if it were his actual judgment and a judgment of the Superior Court.

144.    Forever after, that act of signing the Consent Order by the Honorable Stephen F. Eilperin in the municipal courts of the District of Columbia, an act of treating a private agreement between less than all of the parties to the litigation that effectively disposed of the object of the litigation without notice to the other parties or an opportunity for the other parties to participate, despite many efforts by these plaintiffs to have it treated otherwise, that Consent Order has been treated as a judgment and even a *res judicatae* at the instance of Vo and Sun.

145.    Yet this was a private act by two or three parties (if you count Vo's company, Suntech) out of six that disposed of the cases of these present plaintiffs as if it were a permanent injunction, not an independent judgment by a judge at all.

146.    That this act was not an independent judgment of the defendant Superior Court was recognized by a panel of the United States Court of Appeals of this circuit, in an opinion by

Judge, later Chief Judge, Harry Edwards in *Hoai v. Sun Refining & Marketing, Inc.*, 866 F.2d 1515, 275 U.S.App.D.C. 397 (CADC 1989).

147.    Thus, the Honorable Stephen F. Eilperin, like the Honorable Annice M. Wagner a few days before, stepped outside the bounds of his judicial discretion, and outside the bounds of his role as a judge, and, using his color and authority as a judge of a municipal court, acquiesced and joined n the collusion between Vo and Sun to give the gas station franchise to Vo and take it away from Hoai and, at the same time, foreclosed any hearing on a possible temporary injunction and made the TRO, which also had been imposed by a judge stepping outside her judicial role, a permanent injunction under the doctrine adopted by the D.C. courts that a judge can do no clear wrong or work any manifest injustice.  Judge Eilperin continued the policy begun by Judge Wagner of choosing to join with and assist a would-be ethnic mafia rather than their victim and those seeking to assist the present plaintiff Hoai as that victim.

148.    That this Consent Order was an illegal private act of collusion between Vo, his company Suntech, and Sun was later ruled by this Court in Hoai's successful PMPA case against Sun.

149.    After the Court of Appeals opinion cited above, Hoai's PMPA case against Sun went forward in this Court and the present plaintiff Hoai successfully moved for summary judgment against Sun on the precise contention that this Consent Order was an illegal act, a termination of Hoia's franchise by Sun in violation of the PMPA, 15 U.S.C. § 2801 *et seq.* See the October 1, 1990 opinion by the Honorable Louis F. Oberdorfer of this Court which granted summary judgment to the present plaintiff Hoai on the issue of liability in his PMPA suit against Sun after the Court of Appeals opinion cited above reversed the Honorable Judge Louis F. Oberdorfer's initial stay of Hoai's PMPA case, as reported on Lexis-Nexis at 1990 U.S.Dist. Lexis 13015.

150.     Since, as this Court has ruled and is now a *res judicatae*, Sun illegally terminated the franchise of Hoai under the PMPA by the private act of the said Consent Order which was given the color and authority of the law of the District of Columbia by the Honorable Stephen F. Eilperin the franchise at that point clearly did not, by the holdings of this Court and the clear law underlying the holdings of this Court, belong to Vo, it belonged to Hoai.

151.     Therefore, since the complaint of Vo and his company, Suntech, in the Superior Court, ignored the controlling law, including that ruled upon in this Court and the United States Court of Appeals for this circuit, and falsely was based almost entirely upon the notion that the franchise belonged to Vo, it should have been dismissed long since and the counter and third-party claims of these plaintiffs in the Superior Court should have been addressed and resolved on their merits.

152.     Pursuant to a plan devised by a Superior Court judge to split the claims in the case between the D. C. courts and the federal courts, portions of the claims of the present plaintiffs were tried in this Court and resolved.  Yet, after these rulings as set out above were obtained in this Court and the U. S. Court of Appeals for the District of Columbia Circuit, the judges of the municipal D. C. courts have refused to address the merits of the defenses and claims of these plaintiffs in the Superior Court action.  They have refused to even examine in light of applicable and controlling authority the contentions of these plaintiffs, or to examine in light of controlling law and the rulings referred to, the baseless complaint of Vo and his company, Suntech.

153.     When the complaint of Vo and his company Suntech was removed briefly to this Court and then remanded on other grounds, these plaintiffs filed a Rule 12(b) (6) motion to dismiss the complaint of Vo in light of the controlling authority already cited.  That authority was ignored by a Superior Court judge, the Honorable Frederick H. Weisberg, and he thus, without even analyzing the complaint and without even noticing the existence of the controlling law

alluded to, rubber stamped the clearly wrong decisions previously set out in the Superior Court and continued the manifest injustice allowed.

154.    When the present plaintiff John D. Hemenway and present counsel for these plaintiffs persisted in attempting to show the baseless nature of Vo's complaint and contentions, including seeking Rule 11 sanctions, the Honorable Frederick H. Weisberg, rather than pay any attention to, much less analyze and apply the controlling law, threatened the present plaintiff John D. Hemenway and the present undersigned counsel with sanctions if they persisted in attempting to show the baseless nature of Vo's claims and to show that the decisions by the Honorable Judge Annice M. Wagner and the Honorable Judge Stephen F. Eilperin, such as they were, were clearly wrong and worked a manifest injustice.

155.    Thus the Honorable Judge Frederick H. Weisberg too joined in the effort to assist a would-be Vietnamese ethnic mafia and harm its victim and those who would assist him. It is difficult to conceive more of a manifest injustice than these early decisions that were clearly wrong, as now shown by this Court, and the policy of refusing to correct decisions and actions (even if not properly judicial decisions at all) by judges of the Superior Court that were clearly wrong.

156.    After the Honorable Frederick H. Weisberg of the Superior Court imposed a plan upon the litigation whereby the present plaintiffs were to present their federal claims in this Court and then return to the Superior Court of the District of Columbia to finish up their non-federal claims there, and after these plaintiffs had brought and concluded their federal claims in this Court as mandated by the Honorable Judge Frederick H. Weisberg, these plaintiffs returned to the Superior Court to pursue their claims there. At that point, with the above-alleged rulings in place as *res judicatae*, judges of the Superior Court, and the defendant the Honorable Herbert Dixon, Jr.in particular, continued this policy of refusing to correct the clearly wrong early actions and decisions in this case. They refused to apply the rulings of this Court and the United States

Court of Appeals as *res judicatae.,* The Honorable Judge Herbert B. Dixon, Jr., now seeks to dismiss the defenses, counter and third-party claims of these present plaintiffs altogether rather than change the policy of not correcting clearly wrong actions and decisions by other judges of the Superior Court early in the case, even a TRO and the Consent Order that had no authority as judicial acts.

## XIV.

### DEFENDANT D. C. COURT OF APPEALS CONTINUES THE POLICY THAT NO JUDGE OF THE SUPERIOR COURT CAN BE WRONG BY DUCKING

.

154.    The present plaintiffs appealed these clearly wrong early decisions to the defendant District of Columbia Court of Appeals on an interlocutory basis, alleging that these first two and other early decisions in the Superior Court litigation were clearly wrong.

155.    The defendant District of Columbia Court of Appeals continued the policy of seeing no wrong and no evil by holding that the clearly wrong early decisions in the case were moot.

156.    Rather than analyze and apply the controlling law and so have to find that the decisions and actions of the Honorable Annice M. Wagner and the Honorable Stephen F. Eilperin as alleged above were clearly wrong and worked a manifest injustice inasmuch as they showed the defendant courts assisting a would-be ethnic mafia rather than applying the law and giving a Vietnamese-American oppressed by such a group the proper benefits of America's legal system, the defendant District of Columbia Court of Appeals ducked by declaring the TRO and the Consent Order moot.

157.    These actions and the orders manifesting them were not moot.  The clearly wrong TRO had been made into a permanent injunction by the improper and violative decision of the Honorable Stephen F. Eilperin and was still affecting, and still does affect, the present plaintiffs.

It has been the engine of the suppression of their rights, and that suppression has been protected by the policy complained of.

158.    Further, the termination of the franchise of Hoai by Sun when it executed the illegal Consent Order in collusion with Vo, a man its personnel knew was the ringleader of the would-be Vietnamese ethnic mafia, was the very act that this Court found illegal as an improper termination by Sun of Hoai's Sun franchise.

159.    In so finding this act illegal this Court ruled that Hoai's damages under the PMPA would be severely limited but that he could, if had brought common law counts relating to the said collusion between Sun and Vo, have his additional damages heard.

160.    In fact Hoai, and the other two present plaintiffs brought such common law counts in the Superior Court litigation when they filed their counter and third-party claims.

161.    But, because of the policy complained of in this law suit, those claims have never been allowed to be heard or even treated seriously in the Superior Court, and discovery with regard to them has been blocked and suppressed. Even after this Court ruled, its rulings have not been applied in the Superior Court; instead, every effort has been made to see that the Vietnamese ethnic would-be mafia is not held accountable and Sun's cooperation with that would-be mafia is not held accountable.  This is a continuation of the policy complained of in this law suit.

.

154.    The defendant D. C. Court of Appeals has enforced this policy by ducking its responsibility in order to avoid having to point out that the early decisions in the defendant Superior Court were clearly wrong and that the Superior Court continued to avoid correcting them and insisted on siding with the would-be ethnic Vietnamese mafia of which Vo was a ringleader.  This avoidance continued as the Honorable Annice M. Wagner, who made the first of the clearly wrong decisions that would have to be corrected, rose to become Chief Judge of the D. C. Court of Appeals; she retired in June of 2005, at which point the defendant the Honorable Herbert Dixon tried to get rid of the litigation in order to prevent any access to the justice system

for these plaintiffs rather than allow a Vietnamese-American and those who came to his assistance have meaningful access to the justice system

## XV.

## CONTEMPT FOR THESE PLAINTIFFS AND THEIR CAUSE AND A PLAN IMPOSED ON THE LITIGATION

163.    Plaintiffs have previously alleged how the Honorable Frederick H. Weisberg, when the subject litigation was assigned by him, rubber stamped the earlier clearly wrong decisions without ever even bothering to look at the controlling law, though urged to do so many times by these plaintiffs, and also how, when these plaintiffs attacked the baseless nature of Vo's filings, the Honorable Judge Frederick H. Weisberg threatened the present plaintiff John D. Hemenway and the undersigned counsel with sanctions.

164.    The Honorable Frederick H. Weisberg also made it clear that he did not want to acknowledge or hear about the mob style actions of Vo and his cohorts.

165.    The Honorable Judge Frederick H. Weisberg made it clear that he wanted the subject litigation to be a dispute between businessmen and that he did not want lies called lies or mob type activity characterized as what it was.

166.    The Honorable Judge Frederick H. Weisberg discouraged such accurate descriptions from these plaintiffs and encouraged ridicule of such accusations as engaged in by Vo's counsel and Sun's counsel after Sun switched sides and began to coordinate with the man, Vo, that Sun knew had threatened physical harm to its dealer, the present plaintiff Hoai.

167.    The Honorable Judge Frederick H. Weisberg bemoaned the fact that the litigation was contentious and made it clear that he did not think that his court should have to deal with such things as righting the wrongs committed by a would-be ethnic mafia.

168.    This was the beginning of the racist attitude, later to unfold more fully, that a mere Vietnamese-American such as the present plaintiff Hoai should not have the right to have the use of the Superior Court to prove and gain compensation for the wrongs that he and the Hemenways

35

alleged had been committed.  Justice was and is denied to a Vietnamese-American set upon as Hoai was.

169.    After these plaintiffs initiated their third-party claims against the other members and aiders of the would-be ethnic mafia, and after these plaintiffs brought their federal claims, including Hoai's claim under the PMPA, against Vo and against Sun and other third-party defendants, the Honorable Judge Frederick H. Weisberg then imposed a plan upon the litigation. Under Judge Frederick H. Weisberg's plan these plaintiffs would try their federal claims then pending in this Court with the Superior Court litigation temporarily suspended while they did that.  Judge Frederick H. Weisberg's plan called for the plaintiff then to return to the Superior Court to have the balance of their claims tried there.  The claims include the common law claims such as interference with contract, conspiracy and so forth, that they had brought against Vo and Sun as well as others for Sun's having joined with the would-be ethnic mafia to join the oppression of their own dealer at the instance of their local counsel, who had chosen that course rather than simply get Sun dismissed from the case pursuant to the RSSA and the franchise agreement conditions precedent.

170.    This plan of splitting the claims between the federal courts and the Superior Court was imposed upon the case by the Honorable Judge Frederick H. Weisberg following colloquy at hearings on September 16, 1988 and March 14, 1989.

171.    In accordance with and in obedience to this plan as imposed by the Honorable Frederick H. Weisberg, these plaintiffs moved for a stay in the Superior Court and that stay was granted. The Superior Court litigation halted pending the resolution of the federal cause of action claims of these plaintiffs in this Court in an Order signed by the defendant, the Honorable Herbert B. Dixon, Jr.

## XVI.

## THE PROCEEDINGS IN THIS COURT

172.    These plaintiffs filed two suits in this Court under the plan imposed upon the litigation by the Honorable Judge Frederick H. Weisberg, suits which duplicated similar counts in their counter and third-party claims in the Superior Court litigation.

173.    One suit was dismissed and the other resulted in a summary judgment in favor of the present plaintiff Hoai on liability followed by a jury trial in which a jury awarded him damages, although the damages were limited.

174.    The suit that was dismissed was brought by the present plaintiffs pursuant to civil rights statutes including particularly 42 U.S.C. § 1983

175.    At that time it had not yet been established in the case law as it was subsequently, as alleged above, that the District of Columbia and its agencies, including its courts, could be sued as a municipality and municipal agencies under 42 U.S.C. § 1983.

176.    Therefore the present plaintiffs at the time sued only Vo, Sun and the private parties under 42 U.S.C. § 1983, and not the present defendants. *Hoai, et al. v. Vo*, Civil Action No. CV 89-2397.

177.    As a result, the suit by the present plaintiffs under 42 U.S.C. § 1983 was dismissed on the grounds that there was no governmental involvement alleged, with the finding that what the private defendants were alleged to have done was merely private abuse of process. That dismissal was affirmed on those grounds by the United States Court of Appeals for this circuit.

178.    Private abuse of process is addressed in the counter and third-party claims of these plaintiffs in the Superior Court litigation that the defendants have never seriously addressed or allowed to proceed.

179.    These abuse of process claims are among those that the defendants have been suppressing and refusing to allow to come to any hearing, full discovery, or even a ruling where the controlling law is considered and applied in order to deny to these plaintiffs their federal

rights as alleged herein and deny to a mere Vietnamese-American the proper benefits of the American legal system because of his race.

180.     The present plaintiff Hoai filed another suit in this Court against Sun as the only defendant under the Federal Petroleum Marketing Practices Act (PMPA), a statute which exclusively provides for service station franchisees to sue oil company franchisors. *Hoai v. Sun Refining and Marketing Company, Inc.,* Civil Action No. 87ca02456.

181.     In the PMPA suit in this Court, Hoai sought to have the act of entering the private agreement which the Honorable Judge Stephen F. Eilperin signed as a Consent Order declared an illegal termination under the provisions of the PMPA.  Hoai succeeded in this effort.

182.     By a ruling of this Court the private act by which Sun switched sides in the Superior Court litigation and colluded with Vo to take over and operate his franchise, was declared an illegal termination of Hoai's franchise by Sun under the PMPA, meaning, obviously, that the franchise and station never belonged to Vo.

183.     Hoai sought in this Court all damages that the PMPA allowed and then this Court determined what damages were allowed to Hoai under the PMPA.

184.     Hoai brought his PMPA action against Sun in this Court in reliance upon the plan imposed upon the litigation by the Honorable Judge Frederick H. Weisberg of the Superior Court.

185.     According to the Honorable Judge Frederick H. Weisberg's plan, any claims or damages not encompassed in the federal claim pursuant to the PMPA would remain pending in the Superior Court, to be pursued once matters were wound up in this Court and the stay in the Superior Court was then lifted.

186.     So that, according to the Honorable Judge Frederick H. Weisberg's plan, whatever claims and damages not allowed under the PMPA that Hoai might not recover because of this Court's determination of what damages were allowed under the PMPA would remain to be claimed in the Superior Court under the non-federal claims, particularly tort claims, that Hoai and

the other two present plaintiffs had filed in that Court would remain stayed and pending, awaiting the outcome of the determination about the nature and extent of damages under the PMPA in this Court..

187.    Although he was informed of the plan of the Superior Court Judge Frederick H. Weisberg, that these plaintiffs proceed with their federal claims in the federal court and then go back to the Superior Court to finish up their common law claims there, the judge of this Court to whom the case was assigned, the Honorable Louis F. Oberdorfer, sought to avoid taking action and insisted that the claims of Hoai in the Superior Court should go ahead while he stayed action in this Court.

188.    The plaintiff Hoai reversed that decision in an interlocutory appeal taken under the collateral order doctrine as already set out.  *Hoai v. Sun Refining & Marketing, Inc.*, 866 F.2d 1515, 275 U.S.App.D.C. 397 (CADC 1989).

189.    The decision of the Court of Appeals of this circuit found that the Superior Court wanted the federal causes of action to proceed in this Court and found that the consent order of the Superior Court that had effectively turned the original TRO (of which more below) into a permanent injunction without any notice to these plaintiffs as defendants, counter and third-party plaintiffs in that court represented no independent judgment of the Superior Court.

190.    On the basis of that decision of the United States Court of Appeals for this circuit, the plaintiff Hoai then obtained summary judgment against Sun on the issue of liability for the illegal termination of the franchise in violation of the terms of the PMPA.

191.    In granting partial summary judgment to the present plaintiff Hoai as the plaintiff in that PMPA case, the judge of this Court held that a Consent Order entered into under the Judge-in-Chambers procedure then in effect in the Superior Court of the District of Columbia between Vo and Sun only, without any notice to Hoai (or for that matter, the Hemenways) illegally terminated Hoai's franchise with Sun under the PMPA.

192.     This is the same consent order between the two parties Vo and Sun that the United States Court of Appeals for this circuit had already held constituted no independent judgment of the Superior Court.  See the October 1, 1990 opinion by Judge Louis F. Oberdorfer, of this Court granting summary judgment to present plaintiff Hoai in his PMPA case against Sun after Hoai reversed the stay of his PMPA action in the U. S. Court of Appeals opinion alleged above.  That opinion of this Court is reported on Lexis-Nexis as 1990 U. S. Dist.  Lexis 13015.

193.     Hoai, as the PMPA plaintiff in this Court, and Sun, as the PMPA defendant, then filed motions and briefs concerning the damages that would be allowed to be tried in this Court before the jury.

194.     The Honorable Louis F. Oberdorfer of this Court considered the nature of the damages to be allowed to Hoai against Sun under the PMPA and rendered an opinion in a Memorandum of May 2, 1991, that confined the damages under the PMPA to contract damages, ruling that tort damages would have to be sought separately in separate claims.

195.     The Honorable Louis F. Oberdorfer specifically ruled that such tort claims as "abuse of process, wrongful eviction, intentional infliction of emotional distress, conspiracy to interfere with contract, waiver, estoppel,…" and others were not encompassed under the PMPA and could and should be brought separately.

196.     Judge Oberdorfer specifically ruled that the PMPA does not prevent franchisees from suing under state law.

197.     Hoai and the other two present plaintiffs had sued under D. C. law as coming under Judge Oberdorfer's ruling in their counter and third-party claims in the subject Superior Court litigation for these and other torts.

198.     Those claims were pending in the Superior Court when Judge Oberdorfer made the rulings referred to and, under the plain imposed upon the litigation by the Honorable Judge

Frederick H. Weisberg, remained stayed there pending the outcome of the federal litigation, to be taken up and prosecuted when the stay in the Superior Court was lifted.

199.     Further, the Honorable Louis F. Oberdorfer, in ruling upon damages to be allowed under the PMPA in the suit brought in this Court by Hoai against Sun under that Act, limited the contract damages that were to go to the jury to a very short term, saying that Sun sent letters of termination of the franchise to Hoai, and gave as a reason for termination, Hoai's problems with Vo that caused Hoai to be absent from the station and unable to run it.  This was dicta as Judge Oberdorfer had already held that the Consent Order between Sun and Vo illegally terminated Hoai's franchise and there cannot be two terminations of the franchise.

200.     It did cause a problem because it intimated that if Sun colluded with Vo so as to join with Vo and harm Hoai, which was what the Consent Order that was an illegal termination was, Sun would not be responsible.   This was also dicta because Judge Oberdorfer specifically ruled that if Hoai wanted damages over and above those allowed by the PMPA he would have to bring separate common law counts, which he had done in the Superior Court and were pending there.

201.     The tort claims brought in the Superior Court by Hoai and the other two present plaintiffs had been stayed and were and are now still standing, encompassing collusive harmful acts in which Vo and others and Sun participated jointly.  These plaintiffs are entitled to have Sun held to account for such collusive acts under the plan imposed upon the Superior Court litigation by the Honorable Judge Frederick H. Weisberg.  This is particularly true of interference tort claims and conspiracy to interfere type claims.

202.     A trial was then held in this Court on the amount of the damages resulting from the illegal termination of Hoai's franchise by Sun as so limited by Judge Oberdorfer and a verdict was returned against Sun.  After extensive resistance which was found to have no merit, some

five or six years later, Sun paid those damages and an award of counsel fees and expenses under the fee-shifting provisions of the PMPA.

203.     After the actions in this Court were over and all appeals exhausted, these present plaintiffs moved to lift the stay in the Superior Court and it was lifted.

## XVII.

## BACK IN THE SUPERIOR COURT: THE STAY IS LIFTED, THE PLAN IS IMMEDIATELY VIOLATED

203.     On December 31, 1997, with all matters in this Court and the U.S. Court of Appeals concluded, these plaintiffs filed a motion in the D. C. Superior Court to lift the stay that had been granted there while the then federal claims of these plaintiffs were tried in this Court, as mandated by the Honorable Judge Frederick H. Weisberg of the Superior Court.

204.     The motion to lift the stay in the Superior Court was not opposed and it was granted in an order signed on March 4, 1998 that was docketed on March 12, 1998.

205.     At that time there were outstanding in the Superior Court from before the stay a substantial number of motions by these plaintiffs that had not been ruled upon, although fully briefed.

206.     Ruling upon these motions would have substantially advanced the litigation.

207.     For example, a comprehensive motion to enjoin Vo from proceeding with his suit against these plaintiffs based upon his agreement to abide by the word of Ernie Peele as to who was the dealer and franchisee had been outstanding for years.

208.     A motion to compel Vo to give information and allow himself to be fully deposed in accordance with an order he had ignored was outstanding and had been for years.

209.     When the stay was lifted these plaintiffs immediately began preparing a comprehensive motion to dismiss Vo's complaint by applying the rulings of this Court such as that the franchise belonged to Hoai and not Vo when it was illegally terminated since this Court,

following the U. S. Court of Appeals found that Sun illegally terminated the franchise of Hoai not of Vo and found that Hoai was having difficulty getting Vo out of Hoai's station which Hoai had to be in as the Sunoco franchise's owner, as one of the factors this Court considered in deciding on damage limitations.

210.    A short time later these plaintiffs filed this comprehensive motion to dismiss Vo's Superior Court claim and for other findings based on the rulings in this Court, applied as *res judicatae*.

211.    This motion thoroughly presented the case that because this Court had ruled that Sun illegally terminated under the PMPA a franchise and station lease as part of that franchise that belonged to Hoai, it cannot have belonged to Vo and that, further, since this Court had ruled that tort damages could not be obtained by Hoai under the PMPA, the tort claims of Hoai and the other two present plaintiffs left pending in the Superior Court under the Honorable Judge Frederick H. Weisberg's plan to split the litigation could thus be pursued to their conclusion in the Superior Court with the stay lifted, including those torts, such as interference claims, that involved collusion between Vo and Sun as well as others.  This was a request to the Honorable Herbert B. Dixon, Jr., to apply the rulings of this Court, which were *res judicatae* creatng issue preclusions.

212.    If this motion were ruled upon and the rulings in this Court applied under the plan of the case imposed upon the litigation by the Honorable Judge Frederick H. Weisberg in the Superior Court were applied, the TRO of Judge Annice M. Wagner, the Consent Order signed by Judge Stephen F. Eilperin that made the TRO a permanent injunction and the early opinion of the Honorable Judge Frederick H. Weisberg rubber stamping the TRO of Judge Annice M. Wagner in violation of controlling law would all have to be held to be clearly wrong, the collusion of Sun with Vo under the tort claims of  these plaintiffs would have to be addressed, and a manifest injustice would have to be found to have resulted in the form of the racist treatment by which

Hoai's complaints against the would-be ethnic mafia that the defendant courts mocked and refused to take seriously would have to be addressed; the American justice system would have to be made available to Hoai and to the Hemenways who assisted him.

213.     To this day the defendant Superior Court and the defendant the Honorable Herbert B.Dixon. Jr., have refused to rule upon this motion along with many other motions of these plaintiffs from both before and after the litigation in this Court, all of which motions, if ruled upon, would require the dismissal of the Vo complaint and the prosecution of the claims of these plaintiffs including those claims which include Sun as a third party defendant.

214.     Such resolving of outstanding motions in the Superior Court, were the rulings made in this Court and the United States Court of Appeals for this Circuit to be applied, would require a reexamination of the earlier actions and decisions and rulings in the case from the Honorable Annice M. Wagner, the Honorable Stephen F. Eilperin and the Honorable Frederick H. Weisberg and recognition that their actions, decisions (such as to sign a private agreement between less than all the parties as a Consent Order of the court) and rulings, were clearly wrong and that in this instance the same had worked manifest injustice.

215.     Sun had been sued by these plaintiffs in a number of tort counts for its collusion with Vo and his cohorts in giving him the station; these were the tort counts that this Court had ruled could not be sued for as part of PMPA claim but must be sued for separately.

216.     Under the plan of litigation imposed upon the litigation of these plaintiffs it by the Honorable Frederick H. Weisberg of the Superior Court, if the plan had been followed and the *res judicata* of this Court applied, these plaintiffs should have been allowed, once the stay was lifted in the Superior Court, to proceed with their tort claims against Sun as a participant with Vo and others in a number of torts.

217.     That did not happen.

218.    Before these plaintiffs could complete and file their comprehensive motion, which was quite detailed and had numerous exhibits, Sun filed a quick motion in the Superior Court case for a summary judgment to dismiss itself from the Superior Court case as a third-party defendant.

219.    In this motion Sun invited the defendant the Honorable Judge Herbert B. Dixon, Jr. to ignore the plan of the litigation imposed upon it by the Honorable Judge Frederick H. Weisberg of the Superior Court and instead dismiss Sun from the case on summary judgment by applying a false *res judicata.*

220.    Sun's hasty motion was based entirely on the concept that since Hoai had brought his PMPA action against Sun in this Court he should have brought all of his tort claims there as well and so should the other two present plaintiffs have done, even though they had no jurisdiction to proceed under the PMPA.  Thus Sun was knowingly ignoring the plan imposed upon the litigation by the Honorable Frederick H. Weisberg of the Superior Court and inviting the Superior Court to violate its own plan, to apply the rule that applies when a judge has not split the claims in order to deprive these plaintiffs of their claims pending in the Superior Court.

221.    For Sun made no mention in its motion of the Honorable Judge Frederick H. Weisberg's plan of the case that the Honorable Judge Frederick H. Weisberg had imposed upon the case.

222.    The defendant the Honorable Herbert B. Dixon, Jr., granted Sun's motion with alacrity.

223.    In fact the defendant the Honorable Judge Herbert B. Dixon, Jr., was so anxious to let Sun out of the case that he granted Sun's motion to dismiss itself from the case on summary judgment initially before the time in which these plaintiffs were allowed under Superior Court rules to file their oppositions had even run.

224.    In dismissing Sun from the litigation so hastily on its quick motion, the defendant the Honorable Herbert B. Dixon, Jr., sent his clerks to research and find authority that would allow him to adopt Sun's position set out in its motion.  The defendant the Honorable Judge Herbert B. Dixon, Jr., gave no consideration whatsoever to researching the plan of the case or the position of these plaintiffs as having accepted that plan and obtained the *res judicatae* that they set out in their motions and filings, including their comprehensive motion detailing how the rulings of this Court should be applied to the Superior Court litigation.  When these plaintiffs sought to draw the Honorable Herbert B. Dixon's attention to the authority of the Restatement of Judgments 2d as to a judge's imposition of a plan to split claims as an exception to the rule that claims should not be split, the Honorable Herbert B. Dixon paid no attention to it.

225.    The defendant the Honorable Judge Herbert B. Dixon, Jr., never even read that material and never considered the rulings of this Court invoked by these plaintiffs and, therefore, never applied the rulings of this Court from the PMPA case of the present plaintiff Hoai to the proceedings in the Superior Court as *res judicatae*.

226.    The defendant the Honorable Herbert B. Dixon, Jr. refused repeatedly to consider and analyze his decision to let Sun out of the case, though it was clearly wrong and worked a manifest injustice, and did so though to do so was in defiance of the Rulings of this Court.

227.    The present plaintiffs made a number of additional filings and motions at that time over a period of months.

228.    The defendant the Honorable Judge Herbert B. Dixon, Jr., ignored them all and has continued to do so up until the present time.

229.    The present plaintiffs filed an interlocutory appeal of the decision to let Sun out of the case in defiance of the rulings of this Court and the plan of the litigation imposed by the Honorable Frederick H. Weisberg.

230.    Sun moved to dismiss the interlocutory appeal.

231.    Without giving any reasons, without considering the rulings of this Court, and without considering whether the decision by the defendant the Honorable Herbert B. Dixon, Jr., was clearly wrong or worked a manifest injustice, the defendant D. C. Court of Appeals hurriedly dismissed the appeal.

232.    The defendant the Honorable Herbert B. Dixon, Jr., then simply did nothing in the case for years, refusing to rule upon any motions of these plaintiffs or to consider or study any of their filings, and waited until the judge who had made the original decision to abandon her judicial rule and act as a prosecutor for the would-be ethnic Vietnamese mafia, as led by Vo, against Hoai and the other two present plaintiffs who sought to assist him in order to oppress and beleaguer Hoai, retired in June of 2005.  In the meantime the Honorable Annice M. Wagner had risen to great power within the defendant municipal courts, having been moved from civil trial work to head of the probate division and then moved upstairs to the defendant D. C. Court of Appeals and then to Chief Judge of the Court of Appeals.

233.    Upon the retirement of the Honorable Annice M. Wagner, in June of 2005, the defendant the Honorable Herbert B. Dixon, Jr., immediately contacted the parties, including Sun, and held a status conference at which he attempted to get the parties, led by Sun and the attorney for Vo, (Vo, in the meantime having disappeared altogether for the second time in the litigation) to simply dismiss everything so that the litigation would conveniently "go away."

234.    The present plaintiffs refused to "go away," believing that they were entitled to have their numerous outstanding motions finally ruled upon, to due process under the Fifth Amendment, to have their defenses and claims ruled upon and heard upon their merits, finally, as part of their right to Petition for the Redress of their Grievances, to have their defenses and claims, to the extent so triable, tried by a jury, and to have a Vietnamese-American, and those who went to his aid under dire circumstances, benefit from the processes of the municipal court system of the District of Columbia just like any other citizen.

235.    The defendant the Honorable Herbert B. Dixon, Jr., indicated that he would prefer to see the litigation dismissed and issued a show of cause as to why it should not be dismissed.

236.    These plaintiffs responded to the show of cause and over a period of time have demonstrated to the defendant the Honorable Herbert B. Dixon, Jr., with additional filings in their motions and briefs all that is alleged in the present complaint.

237.    Yet the defendant the Honorable Herbert B. Dixon, Jr., did. and has to this day done, nothing to correct the clearly wrong decisions in the Superior Court litigation, making it clear that the change of policy complained of herein is in force and that the rulings of this Court will not be applied if to do so would threaten that policy and force the defendants to reexamine and correct a clearly wrong action by a judge of the Superior Court.

238.    Upon examining the files of the Superior Court litigation in chambers at the invitation of the Honorable Herbert B. Dixon, Jr., these present plaintiffs found that many of their motions, particularly the dispositive ones, were not in the court file in any coherent and readable form.  These defendants have supplied the Honorable Herbert B.Dixon, Jr., with coherent and readable duplicates of their dispositive motions and other filings, and still nothing has been done and no action taken to correct the clearly wrong actions of the Honorable Annice M. Wagner, the Honorable Stephen f. Eilperin, the Honorable Frederick H. Weisberg and others, including the defendant the Honorable Herbert B. Dixon, Jr., himself.

239.    Nothing has been done to enforce the Rulings of this Court that were made in Hoai's PMPA action against Sun.  In the meantime the plaintiff Vo in the Superior Court, has, for the second time, disappeared.  His attorney, who formerly moved successfully to be let out of his representation of Vo the first time that Vo disappeared, (and was allowed to re-enter his appearance over the objection of these present plaintiffs and get paid with the bond that was supposed to secure these plaintiffs) admits now that he has not been able to communicate with his

client Vo and has not seen him for years, yet he is allowed to continue to "represent" Vo and a motion to stop this violation of law and the ethics has also been ignored.

240.     The clear pattern has emerged unequivocally that a large oil company, perceived of as part of the establishment, and non-Vietnamese, will be protected at all costs, even if it cooperates with a gang of criminals.  But as to the present plaintiff Hoai and the other two present plaintiffs who came to his aid, the message is clear as regards the American justice system as embodied in the defendant courts: No Vietnamese-Americans need apply.

241.     There was clear indication in the files that these plaintiffs were invited to examine in chambers that when the litigation was reopened in the Superior Court, clerks were instructed to find a way to let Sun out of the litigation in violation of the plan of the case imposed upon it by the Honorable Frederick H. Weisberg and in violation of the rulings of this Court considered as *res judicatae*.

242.     There was no indication whatsoever that the many motions and filings of these plaintiffs had ever been examined or considered or that any consideration had been given to the plan of the litigation imposed upon it by the Honorable Frederick H. Weisberg or to the rulings of this Court in the PMPA case and of the United States Court of Appeals in accord with that plan.

243.     To this date the defendant municipal courts of the District of Columbia have refused to allow these plaintiffs to reach the merits of their defenses to the claims of Vo and his company Suntech as violative of the law.

244.     Instead of allowing these plaintiffs, as it had promised, to pursue their claims in the Superior Court once matters were wound up in the federal courts, the Superior Court has not only blocked, ignored and "sat upon" their claims in every way.  The Superior Court has used the excuse of these plaintiffs, having tried their claims separately in the federal courts as they were induced by the Superior Court to do, to try and get the oil company, Sunoco, out of the case and permanently prevent any resolution between the plaintiff Hoai and his Vietnamese adversary in

the Superior Court proceeding of the matters in controversy between them as pled in the litigation

in that court, thus ignoring its own plan of the litigation as by that time participated in by this

Court, to continue to deprive these plaintiffs of their federal rights in violation of 42 U.S.C. §

1983.

245.    It has now become evident why these events have transpired as they have, and the

real reasons the D. C. courts and their judges and administrators have wanted this case to "go

away" as it involves any resolution of the allegations of plaintiff Hoai and the two non-

Vietnamese who sought to assist him about his being set upon by a would-be Vietnamese mafia,

and why the D.C. courts have sought to prevent these plaintiffs from ever having the truth of their

allegations of this Vietnamese would-be mafia activity, including threats of violence and even

death, reached.  That reason is a racial bias against letting a wronged Vietnamese, and those who

assisted him, have his day in court against a would-be Vietnamese ethnic mafia that had greatly

oppressed and wronged him and with whom both Sun and a prominent judge of the Superior

Court (and, later, of the D. C. Court of Appeals) had sided, the latter in the role of a prosecutor

and advocate, stepping outside the judicial role and, thus, her jurisdiction, altogether.  It is a

custom and practice of denying to a member of a particular ethnic and racial group, and those

seeking assisting him, the benefits of the American system of justice.  Thus a violation also of 42

U.S.C. § 1981 has been perpetrated by these municipal courts.

246.    That this was the aim of the Superior Court judges was made evident in June,

2005, when the Superior Court judge then in charge of the case, after ignoring and refusing to

consider and rule upon every motion of these plaintiffs to advance their cause literally for years,

used the occasion of the retirement of the judge, who made the initial clearly wrong and

manifestly unjust decision, to seek to dismiss the case of these plaintiffs for failure to prosecute.

Thus, after these plaintiffs tried to prosecute their case over and over again with motion after

motion over years, all of which the Superior Court judges refused to rule or act upon, including

particularly the defendant the Honorable Judge Herbert B. Dixon, Jr.,, the Superior Court through its judge then sought to destroy the rights of these plaintiffs to have their grievances redressed and their claims tried by a jury.

### COUNT ONE: ENFORCING THE *RES JUDICATAE*, THE RULINGS OF THIS COURT AND ENOFORCING THE PLAN OF THE LITIGATION

247.    Plaintiffs incorporate herein by reference the allegations of 1 through 246 above.

248.    This Court ruled, in the case brought by Hoai against Sun under the PMPA, that Hoai might and should bring his tort claims separately in order to obtain tort type damages.

249.    Hoai had already, at the time that this Court so ruled, brought his tort claims separately in the Superior Court and they were pending there, stayed in accordance with the plan of litigation imposed by the Superior Court, along with the claims of the other two present plaintiffs.

250.    This Court also ruled that Sun illegally terminated the franchise of Hoai, including the lease as one of the principal elements of the franchise, in violation of federal law, and, thus, ruled that at that time the franchise did not belong to Vo and never had belonged to Vo.

251.    The defendant courts refused to heed this rulings and disobeyed and still disobey the *res judicatae* of the rulings of this Court in defiance of this Court and of the plan of the litigation which the defendant Superior Court itself imposed and which was recognized by this Court and the United States Court of Appeals.

252.    The latest attempt by the defendant Superior Court through the defendant the Honorable Judge Herbert B. Dixon, Jr., to dismiss the Superior Court litigation is intended by the defendants to be a terminal refusal to obey this Court's rulings as established *res judicatae* and to disobey and violate the plan of the litigation which this Court and the Court of Appeals for this circuit took cognizance of and went along with.

WHEREFORE, these plaintiffs pray, in this Count One:

A.  That this Court enjoin immediately, temporarily and permanently, the defendants, and any of them, from dismissing the subject litigation of these plaintiffs in the defendant municipal courts of the District of Columbia, and

B.  That this Court enjoin immediately, temporarily, and permanently, these defendants, and all of them, to proceed immediately with and conclude the subject litigation in the Superior Court, and to do so from the point where the stay was lifted in the Superior Court after the conclusion of matters in this Court and to so proceed in accordance with the plan of the litigation imposed upon it by the Honorable Judge Frederick H. Weisberg of the Superior Court, and

C.  That the Superior Court be enjoined immediately, temporarily and permanently, to proceed from that point considering, finally, the motion of the present plaintiffs to apply the rulings of this Court as *res judicatae,* particularly the rulings of this Court that Hoai and the other two present plaintiffs may proceed with, not only their defenses, but their tort claims against all counter and third-party defendants they named, including Sun, and that

D.  This Court declare that the dismissal of Sun from the Superior Court litigation as a third-party defendant was in violation of the rulings of this Court and the rights of the present plaintiff Hoai and that the same should and must be

reconsidered and those rulings applied so as to include Sun
as such a defendant in the Superior Court litigation, and that

E.   This Court further declare that its rulings that Sun illegally
terminated the franchise of Hoai under the PMPA through its
participation in the above Consent Order entered by the
Honorable Stephen F. Eilperin as a Judge-in-Chambers of
the Superior Court necessarily means that Vo was not an
owner or possessor of the said franchise in any way and that
the defendants apply that ruling accordingly with all results
obtaining from observing that ruling, and

F.   That the defendants recognize that all of the actions of its
judges, such as those of the Honorable Annice M. Wagner
in abandoning the role of jurist to become a prosecutor on
behalf of Vo, and those of the Honorable Stephen F. Eilperin
in participating in the illegal termination of Hoai's franchise
through a procedure on its face, and those of the Honorable
Frederick H. Weisberg in rubber stamping the first two sets
of actions by Superior Court judges without even looking at
the conditions precedent of the franchise agreement as
empowered by the PMPA and the D. C. Retail Service
Station Act are clearly wrong and worked a manifest
injustice, and that, further,

G.   This Court declare that the failure of the defendants to have
a procedure whereby someone such as Vo who "pays" the
bond for a TRO with an NSF check drawn on a service

station he is illegally occupying cannot be held accountable

for failing to meet such  a condition precedent and the failure

of the defendants to have a procedure whereby such actions

do not enable those oppressed by them, such as the present

plaintiffs, from having the TRO held void, is

unconstitutional and deprives these plaintiffs of federal

rights and that, therefore, the said TRO never came into

being and was void *ab initio* with all attendant results in the

litigation of the present plaintiffs, and

H.   Further, that the plaintiffs herein be awarded all of their

costs, including counsel fees, under 42 U.S.C. § 1988 and

that the defendant courts have to pay to the present plaintiffs

all of their costs, including counsel fees, resulting from the

failure of the defendants to have a procedure whereby when

a TRO is not paid it can be declared to be void and

inoperative, including all costs stemming from the extension

of the TRO effectively into a permanent injunction by means

of the unconstitutional Judge-in-Chambers rule and

procedure, to include all costs of the filings and motions to

rectify these matters which were ignored or which were

ruled upon, in the case of  the Honorable Judge Frederick H.

Weisberg, without paying any attention to controlling law

such as the PMPA and the RSSA, and

I.   Such other and further relief, at law and in equity, as to this

Court shall seem meet and just.

### COUNT TWO: DECLARING INVALID THE LAW OF THE CASE
### RULE WHEREBY CLEARLY WRONG AND MANIFESTLY UNJUST
### DECISIONS CANNOT BE CORRECTED AND RESUMING THE OLD POLICY

253.    Plaintiffs incorporate herein by reference the allegations of 1 through 252 above.

254.    The refusal of the defendant municipal courts to follow the plan of the litigation imposed

by the Honorable Judge Frederick H. Weisberg of the Superior Court upon the case and their

refusal to apply the rulings of this Court in accordance with that plan, were an embodiment and

carrying out of their policy not to examine and analyze actions and decisions by judges that are

clearly wrong and that manifest injustice.

255.    A clearly wrong action and decision that worked a manifest injustice in this instance was

the decision of the Honorable Annice M. Wagner to abandon her judicial role and become in

effect a prosecutor for an aspiring ethnic mafia against the present plaintiff Hoai and those

assisting him, and inserting into the litigation a charge against these plaintiffs which had no

backing in the law and required her to ignore the controlling law of the RSSA and the PMPA as it

empowered the franchise agreement between Hoai and Sun with its precedent conditions that the

Superior Court  plaintiff Vo not only knew had not been fulfilled but which he was actually

asking the Superior Court to fulfill for him in violation of Sun's rightful exercise of its authority

to deny him as a potential transferee of the franchise.

256.    Another clearly wrong action and decision was when the Honorable Stephen F.

Eilperin used the unconstitutional Judge-in-Chambers rule and practice to deprive these plaintiffs

of their property and rights in violation of the Constitution by giving a private agreement between

several among many litigants the force of a judgment of the court without any notice to these

litigants who bring this suit, the other litigants in the case, who were thereby deprived of due

process altogether.  That decision also was ruled subsequently by this Court, by necessary

implication, to be one which gave the imprimatur of the Superior Court to a private act which was

an illegal termination by Sun of Hoai's franchise under the PMPA so as to make the TRO

effectively permanent without any hearing or attention to the controlling law and as such was clearly wrong and worked a manifest injustice in giving the station to thugs who had threatened to kill Hoai.

257.    Thus also clearly wrong and working a manifest injustice was the decision of the Honorable Frederick H. Weisberg to continue ignoring the controlling law and to refuse to examine it, in order to rubber stamp what had been done by the Honorable Judge Annice M. Wagner so as to avoid examining decisions and actions that were clearly wrong and worked a manifest injustice.

258.    This decision and action of the Honorable Judge Frederick H. Weisberg was a clear application of the new policy adopted by the D. C. Court of Appeals that decisions that were merely clearly wrong and worked a manifest injustice would not be reconsidered and corrected unless there were new facts put in evidence or an intervening substantive change in the law.

259.    These plaintiffs appealed the decisions and actions of the Honorable Annice M. Wagner and the Honorable Stephen F. Eilperin, and the defendant D. C. Court of Appeals declined to decide whether they were clearly wrong or worked a manifest injustice by declaring them moot, even though they had destroyed Hoai's franchise relationship with Sun and done him extensive permanent damage by effectively putting the Court on the side of his would-be mafia oppressors backed by one of the world's largest oil companies.

260.    The same actions which the defendant D. C. Court of Appeals found by necessary implication to be moot this Court found to be a damaging and illegal termination of Hoai's franchise by Sun; this Court also found that Hoai could bring tort actions separately from his PMPA action for these actions of which Judge Stephen F. Eilperin's actions and decision were a part.

261.    In order to carry out this policy of not reexamining these clearly wrong decisions by the Honorable Judges Wagner, Eilperin and Weisberg, even though clearly wrong and

working a manifest injustice, Judge Frederick H. Weisberg and others continually ignored and left unruled upon many motions filed by these present plaintiffs over years leading up to the present time.

262.    Another clearly wrong decision that worked a manifest injustice was that of the Honorable Herbert B. Dixon, Jr., to refuse to follow the plan of the litigation and to refuse to apply the rulings of this Court once the cases in this Court were over and the stay in the Superior Court litigation had been lifted.

263.    The subsequent refusals by the Honorable Herbert B. Dixon, Jr., to reconsider and correct the clearly wrong and manifestly unjust decisions he made in this regard have been a clear carrying out of this case management practice that the law of the case doctrine means that a judge can do no wrong.

264.    The continuing refusal by the judges of the Superior Court to pay any attention to the fact that Vo had failed to meet the precedent condition of paying a bond for his TRO and that the TRO, therefore, never came into being and was void, when these plaintiffs addressed it in their filings became a further example of this doctrine, combining with the negligence of the defendant courts in not having any procedure, negligently, for enforcing such bond payment failures.

265.    This last particularly worked a manifest injustice in that a man who had illegally taken over a gas station franchise by mob-style tactics was allowed to use the account of the franchise he had illegally taken over to "pay" his bond as a precedent condition with an NSF check drawn on the franchise account.

266.    The application of this doctrine by the D. C. Court of Appeals continued after the lifting of the stay in the Superior Court.

267.    This doctrine of the law of the case as a policy of case management that a judge can do no wrong, even when his or her decision, as here they did, works a manifest injustice is, on its

face, violative of the federal rights of litigants who have been negatively affected by clearly wrong decisions and actions, such as occurred here, that work a manifest injustice. For it states that, where, as here, decisions are made that violate the federal rights of litigants, the defendant D. C. municipal courts will not correct those actions and decisions to protect those rights though they clearly could do so if the older doctrine and practice were restored.

268.    By abandoning the judicial policy under its practice of the law of the case doctrine that interlocutory orders, including TRO's effectively made permanent without the required opportunity for those litigants negatively affected to participate, as here, that were clearly wrong or worked a manifest injustice in favor of a policy of the law of the case doctrine that only allows the vacation or reversal of orders where there is new evidence or newly developed law, the defendant courts of the District of Columbia and the defendant District of Columbia Court of Appeals in particular have violated 42 U.S.C. § 1983 inasmuch as such a policy and doctrine does not allow for the correction of violations of the constitutional or federal statutory rights such as occurred here.

269.    A conscious, judicial policy decision to abandon a policy standard whereby interlocutory orders and decisions will be vacated or corrected or reversed if plainly wrong in favor of a policy that such decisions will only be vacated, corrected or reversed if there are new facts or newly developed law affecting the decision, if done purposefully, is a deliberate deprivation of due process rights as applicable to the District of Columbia under the Fifth Amendment and also of litigants' right under the First Amendment to Petition for the Redress of their Grievances through the courts.

270.    In this case it also has led to an attempt to deprive these plaintiffs of their right to a trial by jury under the Seventh Amendment.

WHEREFORE, in this Count Two, these plaintiffs pray for:

A.  A declaratory judgment that the change in policy by the District of Columbia Courts as set out and alleged is a violation of 42 U.S.C. § 1983 that leaves litigants such as these plaintiffs vulnerable to a violation of their constitutional and federal statutory rights and

B.  An immediate, temporary and permanent injunction against these defendants that the old policy as it was before be resumed and that the courts of the District of Columbia use a policy standard of allowing the vacating, correcting or reversing of decisions, as here, where they are clearly wrong or manifest an injustice, and that, further, decisions that implemented that flawed policy, such as have occurred here in the D. C  courts, be declared violative of the rights of these plaintiffs.

C.  An immediate, temporary and permanent injunction that this flawed policy as it was applied in the subject litigation be considered and examined and that any refusal to reexamine flawed interlocutory decisions in the Superior Court case be reexamined, particularly where these plaintiffs moved in dispositive motions or otherwise for such reexamination and their motions have remained unruled upon for years, and even more particularly where the application of rulings in this Court need to be applied to correct such flawed decisions as were made in the defendant municipal courts of the District of Columbia.

D.  An award of the costs of this proceeding, including reasonable counsel fees, against these defendants pursuant to 42 U.S.C. § 1988.

E.   An award against the defendant courts of the District of Columbia

and other defendants as applicable of all the extra costs, including

counsel fees, caused directly to the plaintiff Hoai by the actions

complained of.

F.   Such further and other relief in law and equity as to this Court

may seem meet and just.

### COUNT THREE: DECLARATORY AND INJUNCTIVE RELIEF:
### THE TRO THAT NEVER CAME INTO BEING

271.   Plaintiffs incorporate herein by reference the allegations of 1 through 270 above.

272.   The TRO that was entered in the subject Superior Court case specifically ordered

that the TRO was conditioned as a precedent condition upon the plaintiff in that matter, Thanh

Van Vo, posting a bond in "cash" of $3,000.00   That TRO, dated August 29, 1986, is

incorporated herein by reference.

273.   Toward the end of the second day of the TRO hearing, which was the day that

the TRO debate was heard to the extent it was heard, counsel for the plaintiff Vo and the plaintiff

Suntech implored the TRO judge to be able to use an attorney's check in lieu of cash.

274.   The plaintiff Vo in the Superior Court pre-emptive strike law suit did not pay for

the ordered precedent condition bond with either cash or an attorney's check.

275.   Instead the plaintiff purported to pay the ordered bond with a check drawn on the

account of the service station franchise that he, as has now been established by decision of this

Court, did not own.

276.   The check was not covered by sufficient funds and Thanh Van Vo knew this

when he issued the check.

277.   In fact what Thanh Van Vo did, as was documented extensively by these

plaintiffs in their filings in the Superior Court which the judges of that court have never read or

heeded (the same is true for the defendant D. C. Court of Appeals and its judges) was to purport

to lend $35,000.00 to the plaintiff Hoai to assist him in capitalizing the Sun franchise, which loan was a fraud. Thanh Van Vo and his would-be mafia colleague Thach set up a bank account for the station, barred the plaintiff Hoai from access to it or knowledge of what was in it. They fraudulently told Hoai that they had put $35,000.00 into the account when in fact they "salted" it with a few hundred dollars. Then they put the proceeds which they appropriated from Hoai's franchise into the account and wrote checks on it, including the TRO one, which bounced. They also bounced a check to Sun for a load of gasoline.

278.    Weeks later the Superior Court notified Vo of the NSF check.

279.    In the District of Columbia a check is not payment unless honored.

280.    Thus the precedent condition was never fulfilled and the TRO never came into being.

281.    Though the Superior Court judges set bonds as precedent conditions and declare them to be such, in fact, the Superior Court is negligent about making such conditions enforceable and provides no mechanism by which, when plaintiffs do not post their bonds within the time specified any consequences result.

282.    It has become the custom in the Superior Court, where often such precedent bond conditions for a TRO are not paid timely, or are not paid, to allow the TRO anyway, to ignore the failure to meet the precedent condition..

283.    The Superior Court judges and administrators have provided no mechanism by which those whose property and liberties are affected by such failures to pay bonds may properly do anything about the failure and protect themselves or cause the TRO to be nullified.

284.    This is neglect which deprives parties such as these plaintiffs of their property without due process of law and of their right to petition for the redress of their grievances.

285.    To add insult to injury, the Superior Court administrators and judges then released the bond money to Thanh Van Vo once he did make his NSF check drawn on the

account of the franchise he was illegally occupying without notice to these plaintiffs or opportunity for them to oppose it, for the purposes of enabling Vo to pay his attorney, who had withdrawn from the case because of Vo's failure to pay his legal fees. Thus the ordered "security" of the bond was a joke and a farce perpetrated through the customs of the Superior Court which further deprived these plaintiffs of their rights.

286.    Every attempt, in filing after filing, by these plaintiffs to bring the invalidity and void nature of the TRO to the attention of the judges of the D. C. Courts went unread and unacted upon. The void TRO that had never come into being, became effectively a permanent injunction.

287.    Thus a fraud was perpetrated upon these plaintiffs by the Superior Court itself and it was a fraud in which Sun knowingly joined when it executed the private Consent Order to purportedly extend the non-existent TRO and colluded with Vo in that effort. It was clearly wrong and worked a manifest injustice and yet, under the policy complained of, the defendant municipal courts of the District of Columbia refused to correct the violative decisions involved.

WHEREFORE, these plaintiffs pray in the Count Four that this Court:

G.    Declare that as a matter of law in any system of Civil Rules such as those of the Superior Court of the District of Columbia, where the Rules are the Federal Rules of Civil Procedure except where modified, a failure to pay a bond that is a precedent condition for the TRO that is sought, for which that bond is security, causes that TRO to never come into being and that that is what happened here;

H.    Enjoin the D. C. Courts to look into the full implications of that failure of the TRO to come into being and be void in the subject case and cease ignoring and failing to read the filings of these plaintiffs trying to get the D. C. courts to look into the question;

I.    Grant to these plaintiffs all their costs of this proceeding,

including counsel fees, under 42 U.S.C. § 1988;

J.    An award against the defendant courts of the District of

Columbia and other defendants as appropriate of all the extra

costs, including counsel fees, caused directly to these plaintiffs

by the actions complained of, that is, all of their costs,

including counsel fees, incurred in having to deal with a void

TRO as if it were a permanent injunction.

## COUNT FOUR: VIOLATION OF THESE PLAINTIFFS' RIGHTS TO HAVE THEIR CLAIMS AND THOSE AGAINST THEM TRIED BY A JURY UNDER THE SEVENTH AMENDMENT AS A VIOLATION OF 42 U.S.C. § 1983

287.    Plaintiffs repeat and incorporate herein by reference the allegations of 1 through 286 above.

288.    In acting in the manner described the defendants meant to assure that Sun and Vo and those working with Vo in the would-be Vietnamese mafia would never have to face a jury on any of the defenses or claims of these plaintiffs.

289.    By never acting upon or ruling upon the motions of these plaintiffs the defendant Dixon and the other defendants, as part of their administrative policy that decisions, such as those of the TRO judge and the Judge-in-Chambers in this case, which are manifestly unjust and just plain wrong, not be subject to correction, meant to keep these plaintiffs' defenses and claims, particularly as they involve the collusion between Vo and Sun, their claims not tried in the federal courts under the claim-splitting plan of the case, from ever being tried before a jury.

290.    Thus they are acting and have acted to deprive these plaintiffs of their right to a trial by jury pursuant to the Seventh Amendment of the Constitution of the United States inasmuch as the service station franchise and all of the claims associated with the illegal

termination of that franchise by the collusive actions between Vo and Sun exceed $50 in value and this deprivation violates 42 U.S.C. § 1983.

WHEREFORE, these plaintiffs pray in this Count Six for the following declaratory and injunctive relief:

A.    That this Court declare that the Vietnamese-American plaintiff Hoai, and the two non-Vietnamese Americans who assisted him in his struggles with the would-be Vietnamese mafia (as they allege) are entitled to have their defenses and claims, to the extent that the same are not disposed of as a matter of law, tried before a jury.

B.    That the defendants be enjoined to see that such defenses and claims that these plaintiffs have that are not disposed of as a matter of law be tried before a jury, even if they involve Sun.

C.    That all of the defenses and claims of these plaintiffs that are so triable be tried before a jury without allowing Sun to be dismissed from the case in the Superior Court on any pretense of violation of any *res judicata* that ignores the plan of the case imposed by the Superior Court;

D.    And that these plaintiffs be paid their costs of this suit, including counsel fees, by these defendants pursuant to 42 U.S.C. § 1988.

E.    An award against the defendant courts of the District of Columbia and other defendants as appropriate of all the extra costs, including counsel fees, caused directly to the plaintiff Hoai by the actions complained of.

F.      Such further and other relief at law and equity as to this

Court may seem meet and just.

## COUNT FIVE: VIOLATION OF 42 U.S.C. § 1981: PURPOSEFUL RACIAL DISCRIMINATION

291.    Plaintiffs repeat and incorporate herein by reference the allegations of 1 through

290 above.

292.    The actions of the defendant the Honorable Judge B. Dixon, Jr., and other

judges of the Superior Court in effectively refusing to advance the plaintiffs' case by refusing to

decide upon any motion they filed, including dispositive motions and motion to compel the

discovery denied them so as to  prevent them from developing and  pursuing their defenses and

claims, while rushing to let Sun out of the case upon the lifting of the stay in the Superior Court

after the split out claims were tried in the federal courts with varying success, were done as a

purposeful racial discrimination to deny to the plaintiff Hoai and the Hemenways assisting him

the benefits of the American system of justice because they were perceived of as a mere

Vietnamese and two non-Vietnamese who had decided to help him when he was set upon by a

would-be Vietnamese mafia.

293.    Even threats of violence to Hoai were derided and not taken seriously by the

Superior Court judges, starting with the Honorable Judge Annice M. Wagner at the TRO hearing.

After all, these were only disputes among a lesser people, as the attitude has now been revealed,

not worthy of finding that decisions that were just plain wrong or manifestly unjust correctable

where they might expose an American company, part of the establishment, such as Sun, to

liability for its actions in colluding with the would-be Vietnamese mafia against their own

contract and their own dealer.

294.    The leaping upon the claimed *res judicata* advanced by Sun in violation of the

plan of the case under which claims were to be split between the Supererior Court and this Court

while ignoring the *res judicatae* advanced by these plaintiffs under the plan as imposed by the defendant Superior Court, the racial bias was made glaringly evident.

WHEREFORE, these plaintiffs pray in this Count Seven that this Court:

G.    Declare that a Vietnamese-American claiming to be set upon and wronged by a would-be mafia of his own ethnic group is entitled to have those claims heard and to have due process and the right to proceed in the courts of the District of Columbia and so too do those who seek to assist him;

H.    That Hoai and the Hemenways have their full rights to benefit from the procedures of the D.C. Courts even if a non-Vietnamese entity, Sun, may be implicated and have to bear liability as a result;

I.    That the District of Columbia Courts be enjoined to proceed in accordance with the above declarations and allow the full measure of justice to these plaintiffs with all their rights honored and their causes heard;

J.    That all of the defenses and claims of these plaintiffs that are so triable be tried before a jury without allowing Sun to be dismissed from the case in the Superior Court on any pretense of violation of any *res judicata* that ignores the plan of the case imposed by the Superior Court;

K.    That these plaintiffs be awarded their costs of this litigation, including counsel fees, pursuant to 42 U.S.C. § 1988.

L.    An award against the defendant courts of the District of Columbia and other defendants as appropriate of all the extra costs,

including counsel fees, caused directly to the plaintiff Hoai by the

actions complained of.

M.       Such further and other relief in law and equity as to this

Court may seem meet and just.

WITH REGARD TO ALL COUNTS, PLAINTIFFS DEMAND IMMEDIATE, TEMPORARY

AND PERMANENT INJUNCTIVE RELIEF AND WILL SEEK A TRO IN SUPPORT.


PLAINTIFFS DEMAND A TRIAL BY JURY


Respectfully submitted,


_____
Laurence A. Elgin #159582
Suite 900, South Building
601 Pennsylvania Avenue, NW
Washington, D. C. 20004-3615
TEL:   (202) 628-1114
FAX:   (202) 628-6798


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have caused the foregoing AMENDED COMPLAINT to be served by hand this 16th day of June, 2006, upon the following defendants:  The Superior Court of the District of Columbia, The Board of Judges of the District of Columbia, and Herbert B. Dixon, Jr., by service upon the Clerk of the Superior Court; and upon the following defendants:  The District of Columbia Court of Appeals, the Panel of Judges of the District of Columbia Court of Appeals, and Eric T. Washington, Chief Judge of the District of Columbia Court of Appeals, by service upon the Clerk of the Court of appeals.


_____
Laurence A. Elgin