# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THANH VONG HOAI, *et al.* | ) |
|       Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:06-cv-00210-RJL |
| | ) |
| | ) |
| The SUPERIOR COURT of the | ) |
| DISTRICT of COLUMBIA, *et al.,* | ) |
|       Defendants. | ) |

### PLAINTIFFS' REPLY TO THE SECOND MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION

The defendants' first argument in opposition is their assertion, beginning on line 2 of their opposition, that the second request for injunctive relief is untimely because the first motion for injunctive relief has not been ruled upon. They cite no authority for this unusual proposition. There in fact is no authority for the proposition that two motions for injunction, addressing different injunctions, cannot be applied for in two separate motions. Here the two separate concepts were initially addressed together in the TRO request but it became apparent at the TRO hearing that the result was obvious confusion. This prevented proper focusing on the separate issues, one of defensive collateral estoppel and the other of offensive collateral estoppel, as the separate issues that they are.

Therefore, prudence dictated filing separate motions, one for each concept. The first motion requested that Vo be enjoined from pursuing his amended complaint with all of its counts save one claiming a possessory right in what was then a Sun franchise when this Court had already decided that the franchise belonged to Hoai in the face of a determined effort by Sun to show that somehow, despite the clear language of the

Petroleum Marketing Practices Act (PMPA)(15 U.S.C. § 2801 *et seq.*) and Sun's own standard franchise agreement (which, as we have pointed out, under the PMPA is the franchise) the franchise belonged to Vo and not Hoai. Sun made this argument that the franchise belonged to Vo rather than its legitimate dealer as set out in its own standard franchise agreement repeatedly and vigorously.  Sun argued in the PMPA case in this Court that this purported ownership by Vo was by virtue of such things as Sun's having entered a private agreement that it was Vo's franchise or Vo having actually operated the franchise when he kicked Hoai out of the station by threatening Hoai with violence. None of these arguments prevailed in this Court despite the collusive and intense cooperation of Vo and Sun in presenting them.

This first concept, which we addressed in the first motion for temporary and permanent injunctive relief, was described by our Court of Appeals for this circuit in the only really significant case that it has addressed on this point which was the essence of our first motion for temporary and permanent injunctive relief.  We speak of its holding in *Thomas v. Powell*, 247 F.3d 260, (D.C.Cir.2001).  Our principal argument in that first injunction motion was that the issue of ownership had been decided by this Court and could not be relitigated in the Superior Court.  The *Thomas* court cited *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988) which we also have cited — several times.  The defendants tried to argue that somehow Vo could continue to claim that he owned the station or some possessory right in it as something apart from the controlling federal law defining what a franchise is, controlling law which leaves no room for the concept of some possessory right in a station apart from the concept of "franchise" as defined in 15 U.S.C. § 2801.  The defendants never really

directly confronted the issue of the franchise as defined in federal law by statute and the ownership of that franchise as so defined having been determined under controlling federal law. Instead the defendants insisted, in arguing that first motion, that everybody ought to be able to sue everybody else so that Vo might go forward against Hoai. In making this argument the defendants paid no attention to *Thomas* or our citation of it. They particularly ignored where the *Thomas* court explained:

> Even if a federal court had not decided all of the issues raised in the state court action, the relitigation exception could apply. Assume, for instance, that issues not decided in the federal action would be resolved in plaintiff's favor in the state court. If the plaintiff still could not prevail because an essential element of his state causes of action had already been determined against him in the federal suit, the relitigation would permit an injunction against the state proceedings. *See, e.g., Next Level Communications v. DSC Communications Corp.*, 179 F.3d 244, 256-57 (5th Cir.1999)(enjoining entire state court action where state court would be required to decide issues already litigated in the federal court.); *see also United States v. District of Columbia*, 654 F.2d 802, 809-10 (D.C.Cir.1981) (finding that relitigation exception permits federal courts to enjoin state proceedings that raise a different cause of action, but still threaten judgment in federal proceedings). *Id.*, at 263

The reference to the 5th Circuit opinion in *Next Level Communications, supra*, is a particularly useful one here. In that opinion the court emphasized the role that an analysis of the arguments presented leading up to the issue decided plays, relying on the controlling authority of the Supreme Court in *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 286, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). *Id.*, 179 F.3d at 252. This was precisely the type of analysis presented by these plaintiffs in their first request for temporary and permanent injunctive relief based on issue preclusion of Vo's claims in the Superior Court in which he baselessly asserts possessory rights in the franchise. Plaintiffs discussed the arguments of Sun on behalf of Vo's in which Sun

misleadingly asserted that Vo had possessory rights which justified Sun's giving of the franchise to Vo in lieu of their legitimate dealer.  Plaintiffs thus showed that the issue of the ownership of the franchise had been decided in this Court in favor of Hoai and against Vo.  The failure of the defendants to even address these arguments and their failure to face the fact of the litigation and decision of the issue of ownership of the franchise in this Court in favor of Hoai strongly indicates that there is no basis for their argument.  Therefore the argument of these plaintiffs should be conceded.

In fact the embrace of the liar and street-hustler Vo, a man whom the judges of the defendant Superior Court knew from the outset had threatened Hoai with violence, continues even now with the Attorney General of the District of Columbia just as it has continued for twenty years with the judges of the D. C. Courts.  Systematically, in the record, over and over again, as with his false claim of having managed service stations, these plaintiffs have exposed the lies of Vo.  Just as determinedly, the officials of the D. C. government have stood by their initial unjustified conclusion that Vo is a substantial businessman, one who purchased a major oil company franchise for one dollar.  One wonders why?  After all, Vo has now disappeared for the second time during the litigation.  One would think that would be some clue.

Vo's own lawyer acknowledges that he has not even had contact with or communicated with Vo for years.  Motions to stop the pretended representation of this thug whom no one has seen for years have been ignored along with all the other twenty years' accumulation of motions.  Does the Court insist that this charade continue and that these plaintiffs should have to seek to relitigate against a hustler and phantom on issues already decided as a matter of comity?  This is not justice.  The Attorney General

desperately embraces the cause of a man that he could not locate if he had to.  Why defer to that which makes no sense except from the point of view of protecting initial bad decisions as set out in the complaint in this case?  Vo's own attorney in the D.C. court litigation, who also represented Vo in Vo's participation in the PMPA case in this Court at depositions, has stated in status conferences during the attempts by the defendant Dixon to get these plaintiffs to "go away," claimed as part of the effort to get these plaintiffs to "go away" that Vo was in Vietnam for medical treatment, based on representations that he, Mr. Robert Pleshaw, said had been made to him by Vo's wife. But there is no evidence other than that as to Vo's present whereabouts or whether Vo is even alive and that representations seems puzzling.  Communist Vietnam is not renowned for medical treatment.

THE FOUR FACTORS: A DISTRACTION

To point to one of the four factors which the defendants seemed concerned with to the point of avoiding the actual issues here that the defendants should have addressed in their arguments: How is the public served by anything that encourages the outrageously wrongful embrace of a thug by a purported justice system at the expense of righteous litigants?  How is it served by a zealous pursuing of the rights of a man who isn't even inclined to show up and have to face the truth?

To point to another factor of the famous four: How are the equities balanced and served by the forcing of the present plaintiffs to have to relitigate issues in which they would have to deal needlessly with the embrace of the thug by the defendants?  Why must these plaintiffs be compelled to relitigate against a street-hustler who used the local

courts to willingly assist him in perpetrating an act in violation of federal law?    How
would that be equitable and how would it serve the public interest?

Looking at the other two of the four factors: Let us take the likelihood of success
on the merits.  As pointed out in briefing the first injunction request, obtaining the
injunction against the relitigation sought to be precluded is the success on the merits.  If
the injunction is granted, the success is achieved; there is no further litigation of the issue
of blocking the relitigation whose chances of success must be measured.  The inability of
the defendants to face this reality is startling.  They continue to go on about the likelihood
of success on the merits not being shown as if, were the injunctions sought to be granted,
there would be some further litigation of the injunction.  The authorities are in agreement
that whether there is preclusion is an issue of law.  It will be decided by our United States
Court of Appeals *de novo* if these injunctions are not granted.

Let us take the final factor not yet discussed in this brief: irreparable harm.  The
authorities seem to agree.  Having to bear the cost and burden of relitigating an issue
decided is the irreparable harm.  Else, why have doctrines of preclusion at all?  Why not
just let people relitigate without end?  As the *Next Level* court pointed out, it would be
"unjust" to bear the costs of relitigating that which has already been litigated and decided.
*Id.,* 179 F.3d at 257.  As this Court held in the opinion that was affirmed in *Thomas,
supra,* "having to endure wasteful relitigation in a [D.C.] court of an issue already finally
decided in this Court is clearly irreparable."   Citing *Laskey v. International Union
(UAW)*, 638 F.2d 954 (6th Cir.1981), *Golden v. Pacific Maritime Ass'n*, 786 F.2d 1425
(9th Cir.1986), and *Samuel C. Ennis & Co. v. Woodmar Realty Co.*, 542 F.2d 45 (7th
Cir.1976) *cert. Denied*, 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977).  *Thomas v.*

*Albright*, 77 F.Supp.2d 114, 123 (D.D.C.1999).  "[T]he potential for nullification or compromise the Court's judgment in the underlying matter is sufficient alone to constitute irreparable injury…"  *Id.*  There is every indication here, underlined by the posture of the Attorney General of the District of Columbia, that the defendants would continue the patter of 20 years of ignoring controlling law, particularly federal law, and would seek to nullify or compromise this Court's judgment.  What factor can the Court cite that the defendants have any interest in doing that which they have continually and actively avoided doing for twenty years?

The harping on the "four factors" as if it were required to repeat the arguments with regard to them in this second injunction request is simply wrong.  The defendants have made no showing that the four factors support their contentions in their opposition to the first motion.  They have inaccurately portrayed the law concerning them and indulged in the same kind of pleading indulged in by counsel for Sun as set out in the support memo for the instant motion.  They advance conclusions that are at best unsupported and irrelevant and, at worst, seriously misrepresentative.  Having failed to counter the plaintiffs' arguments about the four factors with any relevant authority in the first instance, the defendants cite no authority that the arguments on the four factors put forth in support of the first motion for preliminary and permanent injunctive relief by the plaintiffs must be repeated again in this motion.  They have not gone away and it would be superfluous to reiterate them.  To characterize not repeating them needlessly as "insufficient," is irrational and completely unsupported by authority.

## NO NEW AND DIFFERENT ISSUE?

The defendants are also simply wrong in asserting that this second motion of the plaintiffs for temporary and permanent injunctive relief does not raise any issue not addressed in the first motion.  The issue of the Superior Court, considered as an institution, sandbagging the present plaintiff Hoai by inducing him to take his PMPA claim to this Court, try it here separately from his non-federal counter and third-party claims in the Superior Court and then return there and finish up what was left after the federal litigation had run its course, and the impropriety of that sandbagging was not addressed in the first injunction motion.  In fact in response to the first motion the defendants indicated that they wanted all claims apart from the PMPA to proceed in the defendant courts.  If the defendants were to take seriously their own urging, in response to the first injunction motion of these plaintiffs, that all parties be allowed to litigate their non-federal claims, they would concede that Sun too must bear litigation for the non-federal claims against it for colluding with Vo.

The second injunction request seeks to have the prevention of Hoai's going forward against Sun for its collusion with Vo, whom Sun knew to be a street hustler and thug, estopped and to allow for Hoai as against Sun what the defendants claim they want for all the litigants.  By failing to address the actual issue raised by the plaintiffs' second injunction request the defendants exhibit a curious exception to their philosophy as expressed in their opposition to the first motion of allowing all parties to proceed with their various claims.  Obviously Sun committed an illegal act in terminating Hoai's franchise; that has been decided.  Under what doctrine would Sun be exempt from being responsible for its knowing cooperation with thuggery and extortion in the non-federal

claims of Hoai other than deference within an inappropriate buddy system as we have outlined?

This evasive answer should be treated as concession by the defendants that Hoai is entitled to move forward against Sun in the Superior Court with his third-party claims against Sun and that part of the second injunction request should be granted as unopposed. Far from not being at issue, the attempted sandbagging of Hoai by the defendant institutions in violation of the rulings in the federal courts is the issue in the second injunction request of these plaintiffs. They were only raised previously in the TRO request, not in the first request for preliminary and permanent injunctive relief. If the defendants do not wish to face that that is the issue, they should be found to have conceded it. Admittedly the attempted sandbagging does not make the defendants look good. It could be embarrassing were it to be addressed. That would be enlightening to the public that the defendants purport to serve, however, particularly those members of the public that are of Asian extraction.

What is very startling about this erroneous assertion that this second injunction motion of the plaintiffs raises no new issue is that it illustrates an ignoring of the fundamental distinction between defensive collateral estoppel and offensive collateral estoppel. The request to prevent Vo from going forward with his claim that he owned the franchise is the defensive use of collateral estoppel. The issue of who owned the franchise was decided in this Court. These plaintiffs now seek to use it to defend against Vo's claim that he owned the franchise. The issue of these plaintiffs being allowed to proceed with their counter and third-party claims is an offensive use of collateral estoppel. The issue of whether they might proceed on their claims, federal and non-

federal, in the two separate systems separately having been decided in the United States Court of Appeals and this Court, these plaintiffs now wish to proceed with their non-federal claims in the D. C. Courts and wish the rulings that they may so proceed applied offensively so that they might now, in fact, proceed. These are two different uses as the Supreme Court in famous cases has pointed out.

## THE NUMBER OF PAGES PECADILLO

The defendants speak of a 49 page filing. That page number includes the motion, its support memorandum, and the certifications and proposed order. The support memo is within the limit set by the local rule of 45 pages. An explanation should not be necessary. One does not count the motion, the memo and the order proposed and certifications all as the support memo. It is the memo alone that is the subject of the 45 page limit in the local rule, regardless of how the additional pages cause the total number of pages in the electronic filing to exceed the number of 45.

## A SUBSTANTIAL BRIEF IS IN ORDER

The length of the brief is a response to the Court's specific concerns it raised at both the TRO hearing and the hearing on the first injunction request. The Court raised the question of why these plaintiffs would not want to defer to the judgment of the defendant Dixon. It was important to make it clear just why that would be inappropriate. Therefore the present plaintiffs set out at length the history and details of the case that Judge Dixon persisted in paying no attention to in his desire to assist his friend, the Sun counsel and, in the process, sandbag the plaintiff Hoai and his rights, and, as a consequence, the Hemenways as well. They have all suffered for years from this inappropriate behavior from several judges of the defendant Superior Court and should

not be subjected to it any further.  While the defendants, plaintiffs believe, will be enjoined as a result of this lawsuit to adhere to the Rule of Law, it is not appropriate to start off by allowing the same judges that have persisted in ignoring the law to be given an opportunity to ignore it further.

The important thing for these plaintiffs in the second injunction request was to address the Court's seeming reluctance to face the inappropriate manner in which the plaintiffs have been treated in the Superior Court and to defer out of concern for our old friends abstention and comity.  The most glaring example of why such concerns do not obtain here was the sandbagging of Hoai and his rights against Sun by the defendant Dixon.  There was no need to repeat the arguments about the four factors; they had already been made in the first injunction request.  In fact the argument of the defendants in this regard makes little sense.  If there were no new issues raised here, why would there need to be a repetition of the arguments already made?

Since, as we have pointed out previously, it is not clear whether the Anti-Injunction Act, 28 U.S.C. § 2283 applies to the District of Columbia, abstention and comity may not be at issue here in the same manner as if it did clearly apply.  See the dissent of Judge Sentelle in *Thomas v. Powell*, *supra*.  However, were it considered, as we have pointed out in our opening brief on this motion, it is clear that the defendant Dixon has already attempted once to nullify and compromise the judgment of this Court. He failed because in helping out his friend, the counsel for Sun, he violated controlling authority.  Why should these plaintiffs be required to face the possibility that he would make another such attempt?  Wouldn't that be exposing them to that very irreparable harm mentioned in the quote from *Thomas v. Albright, supra*?  Once a Superior Court

judge, as the defendant Dixon has done, seeks to compromise and nullify, in this case, not only the rulings in the federal courts, but even the plan to split the claims between non-federal and federal imposed upon the case by an earlier decision by another Superior Court judge, and has done so for purposes of collegiality and favoritism, why should these plaintiffs have to bear that risk any further?  Here the "bar establishment" attitude that appears to have contributed to the way Sun was favored clearly did not, at least at that time, include an ability to see the plaintiff Hoai as one whose rights should be taken seriously as against Sun.

ANOTHER EXAMPLE

This same attitude, it must be noted, was exhibited in the approval by a judge of the defendant Superior Court of the very illegal act of terminating the franchise of Hoai by Sun which the plaintiff Hoai had to go to the federal courts to have the termination treated as the illegal act that it was.  Sun illegally made a private agreement with Vo to give Vo Hoai's franchise.  The two parties, Sun and Vo, or three parties if you count Vo's company Suntech, that he had created when he took over Hoai's franchise with threats of force and a sham "loan" of capital loan that did not exist, drew up their agreement, called it a "Consent Order," and got a Superior Court judge to sign it.  Then they argued, successfully in the defendant courts but ultimately unsuccessfully in the federal courts, that it was an "Order" of the defendant Superior Court.

When Vo and Sun collusively performed this illegal act they did not include either Hoai or the Hemenways.  Yet Hoai and the Hemenways were parties to the Superior Court litigation just as much as Vo and Sun.  We would ask the Court to ask itself:  What kind of judge signs an "Order" drawn up between two, or even three parties

to a litigation (one party being but the alter ego of another party), an "Order" which transfers something as valuable as a major oil company gas station franchise, and takes no measures to see that three other parties to the litigation, including the owner of the gas station franchise, are notified and given an opportunity to be heard?  As was noted by Judge Oberdorfer, Judge Eilperin did not even see that Hoai himself received a copy of the "Order" as signed.  No explanation that can be given a judge behaving in this way supports any concept that Hoai would be given a full and fair opportunity to have properly relitigated rights that he has already litigated and had decided in his favor in the federal courts.  Was it ignorance?  That is not credible.  It was some form of favoritism and bias.  The most charitable explanation would be that Judge Eilperin, like Judge Dixon, was presented with highly misleading representations, one might accurately call them lies if they included representations that there were no other interested parties. Whatever it was the deference to Sun to the extent of overlooking the Constitution is not conducive to any comity being extended on the relitigation issue.

In the old case of *Franklin v. Chas. C. Schulman Co.*, 31 A.2d 871 (D.C. 1942) Judge Hood, of the old Municipal Court of Appeals for the District of Columbia, held that "No step in the course of a legal controversy should be taken without notice to opposing party."  He cited in support of this holding the cases of *Karrick v. Wetmore*, 25 App.D.C. 415, 422, and *Sterrett v. Shoemaker*, 47 App.D.C. 455, 458.  The latter two cases were decided, of course, when the United States Court of Appeals for the District of Columbia Circuit had appellate jurisdiction over the municipal courts of the District of Columbia.  Judge Hood added: "It was urged at the hearing that the appellant was given an opportunity of making his objections to the contents of the statement after it was

signed, but plainly he should have been served with a copy and permitted to make his objections prior to the signing." This argument that objections could be made after the signing and that that was adequate have been raised by Sun repeatedly in the subject litigation, seemingly with success.    Judge Hood went on to say, which would seem equally applicable to the "Consent Order" at issue here: "Where the statement is prepared by counsel for one of the interested parties, with or without suggestions or instructions from the trial court, counsel for the other side is entitled to be served with a copy and afforded an opportunity of making objections prior to final action thereon"  Of course, we would have to acknowledge that had the undersigned been served with a copy of the Order and pointed out that it violated federal law inasmuch as 15 U.S.C. § 2806(b) empowers Sun to have required notice of proposed transfer with an opportunity to vet the proposed transferee, which Sun did and pursuant to that right rejected Vo, that would have been ignored by the defendants.  They also no doubt would have continued to ignore the local statute which deprived Vo of any rights and even took away any jurisdiction he had to sue Sun in the first place.  But still, given the steadfast determination of the defendants to ignore the controlling statutory law governing service stations for twenty years, the failure of a judge to even consider fundamental constitutional guarantees of due process is even more startling.  How can it even be considered that such judges (Judge Eilperin still sits on the Superior Court) would give Hoai a full and fair opportunity to litigate issues already decided in the federal courts?

The undersigned was barely born when the *Franklin* case was decided by Judge Hood, but, as a boy growing up and the son of a prominent attorney in this area, did have the opportunity to meet and observe most of the judges of that era, including the one for

whom this courthouse is named. It is frankly, difficult to imagine that any of them would do what Judge Eilperin did in this matter by way of condoning the illegal termination of Hoai's franchise without checking on whether notice had been given to the other litigants and that they had been given an opportunity to be heard. It suggests strongly, as we have stated, that counsel for Sun and Vo badly misrepresented matters to Judge Eilperin and in fact lied to him. It is the overall thrust of this litigation that since that time of the *Franklin* decision a change has occurred in the way the administrative concept or doctrine of the law of the case is applied in which judges are regarded as more impervious to being corrected for erroneous decisions earlier in a case, in that they may fail to observe fundamental rights in a manner that is clearly wrong and that works a manifest injustice but that such actions may not be corrected unless there is an intervening change in substantive law or new evidence is put forward. As set out in the complaint as originally filed, this change was undertaken and made by the defendant District of Columbia Court of Appeals in published decisions.

In the same time frame, roughly, however, starting in 1990, four years after the subject litigation began in the Superior Court with Vo's filing of his complaint, case law that previously had not existed has made it clear that the District of Columbia is not a state but a municipality for the purposes of 42 U.S.C. § 1983. The main complaint in this case incorporates this law that is new since the subject litigation in the defendant Superior Court began. This would seem to argue that the comity due a state in this instance does not exist as an obligation of this Court in the present instance. We have noted that the municipal courts of the District of Columbia were formerly under the appellate supervision of the United States Court of Appeals for the District of Columbia Circuit

When that changed in 1970, as Judge Sentelle pointed out in his separate opinion in *Thomas v. Powell, supra*, the language of the legislation and that revealing its intent seems to indicate that the District is not a state for purposes of the Anti-Injunction Act and it would seem, therefore, that the traditional comity due a state is not present as regards the District where issues have not been decided.   The District was not part of the founding federal system with its two separate court systems which gave rise to the concerns that led to the Anti-Injunction Act in the 1790's, certainly.

But even were the District of Columbia to be considered, for purposes of comity and abstention considerations, in the same light as a state, the facts set out above and in our opening brief on this second injunction motion concerning Judge Dixon and Judge Eilperin strongly indicate that these plaintiffs might not get full and fair consideration if they had to relitigate issues already won in the federal courts.   In pointing this out we do not "rehash" arguments previously made in connection with the first request for a temporary and permanent injunction as the defendants assert that we do in their opposition.   We are pointing out new arguments that demonstrate concretely that the defendants have already shown that they will not give a full and fair hearing to the claims of the plaintiffs herein.

MORE HISTORY OF WHY THESE PLAINTIFFS CANNOT EXPECT FULL AND
FAIR CONSIDERATION OF THE ISSUES UPON WHICH THEY SEEK
PRECLUSION

But the history demonstrating that these plaintiffs will not receive a full and fair hearing if they had to relitigate the issues already decided in the federal courts is not confined to the instances that we have set out in briefing this second injunction request involving Judge Dixon assisting his friend Gordon and Judge Eilperin signing the illegal

Consent Order as if it really were an Order of the Superior Court.  As we have pointed

out in previous briefing Judge Oberdorfer, in his memorandum opinion of October 1,

1990, reported on Lexis-Nexis at 1990 U.S.Dist. LEXIS 13015, noted that the TRO

issued by Judge Annice Wagner, then a trial judge in the defendant Superior Court, on

August 29, 1986, failed to mention the Petroleum Marketing Practices Act.  What he said

specifically, after he noted that the complaint filed in the Superior Court by Vo

"conspicuously" failed to mention the PMPA, was:

> On August 29, 1986, also without reference to the Act, the Superior
> Court issued a Temporary Restraining Order ("TRO") effective for ten days,
> requiring Hoai and the Hemenways to discontinue the sale of any petroleum
> products or transacting any other business at the premises which Sunoco had
> leased to Hoai and to return possession and occupancy of the premises to Vo.

In speaking of the TRO issued in the Superior Court proceedings on August 29,

1986 as being "without reference to the Act," Judge Oberdorfer was engaging in

understatement.  The record shows that from the outset of the TRO hearing, on its very

first day, August 28, 1986, the Superior Court Judge, the Honorable Annice Wagner, and

the attorneys for Vo, went out of their way to dodge the controlling law, the law that

specifically addresses service station franchises, even though they knew and

acknowledged that it was a service station franchise that was involved.  We attach, as

Attachment A to this Reply brief, a copy of the transcript of the first day of the TRO

hearing.

It is important to keep in mind that the complaint that was filed by Vo on August

28, 1986, the day that the TRO hearing in question commenced, had as its very first

Exhibit, the franchise agreement between Sun and, as Judge Oberdorfer pointed out, Hoai

alone.  See Attachment E to the previously filed motion in this case for a TRO and in

particular paragraph 13 on page 3 of that original verified complaint by Vo in the Superior Court.  Further, just to make it clear for the record the prominent nature of the Franchise Agreement as Vo's first attachment to his complaints in the Superior Court we attach a copy of the Franchise Agreement as Attachment B to this reply brief.  It is quite a bulky document and it has references to "the Act," meaning the PMPA as the controlling law governing a number of aspects of the operation of service station franchises.  For example, it references in Part II, "**GENERAL PROVISIONS**," on page 6, under the rubric: "**17, <u>ENFORCEMENT, APPLICABLE LAW, RENEWAL, NONRENEWAL AND TERMINATION OF THE DEALER FRANCHISE</u>**," at (b): "This Dealer Franchise is subject to and governed by the Act, which is made part of this Dealer Franchise for purposes of expressing the grounds upon which it may be terminated and nonrenewed by the Company."

Again, beginning on the same page of the franchise agreement, under the rubric: "**19. <u>SALE AND ASSIGNMENT</u>**, at (b)(3) on page 8 "the Act" is referenced.  This last is to the provision of 15 U.S.C. § 2806(b) which we have already briefed.  That is the section that empowers a franchise agreement such as this one of Sun's to enable the franchisor to require a lengthy notice of any proposed transfer and an opportunity to examine the qualifications of the proposed transferee and reject unqualified proposed transferees such as Vo.

Exhibit 2 to the Vo complaint was the "One Dollar" contract by which Vo claimed to have purchased the gas station.  See Attachment E to the TRO motion, page 3, paragraph 14.  As Judge Oberdorfer also noted, and as we have pointed out before, the Vo complaint "conspicuously" avoided mention of the PMPA and, in fact completely

ignored the PMPA and directly contradicted the provisions in Franchise Agreements that the PMPA enables.  We attach a copy of the "One Dollar Contract" by which Vo purported to have purchased the station from Hoai as Attachment C to this reply brief just as it was attached to and incorporated in the Vo complaint of August 28, 1986.

Thus, on its face, Vo's complaint sought to have the court allow it to do that which was illegal, namely, force Sun to terminate its own dealer illegally and give the franchise to Vo despite the fact that the contract under which he claimed to own the franchise, since it incorporated the franchise (Remember, under the PMPA the franchise agreement, by preemptive definition, is the franchise) was, on its face, invalid.  It was invalid in that it incorporated by reference the franchise agreement, which, as the franchise, showed in its own clear language that the franchise could not be transferred without precedent conditions being met that the "One Dollar Contract" and the complaint both acknowledged had not been met.  Thus, leaving aside the question of the threats of violence against Hoai, the fraudulent loans, and all the other mob-style tactics employed by Vo and his cohorts, there was no cause of action set out in Vo's complaint.  This also leaves aside the Retail Service Station Act of the District of Columbia, which not only made the purported One Dollar Contract invalid more emphatically than the PMPA enabled provisions of the franchise, but also deprived the Superior Court of any jurisdiction to allow a suit by Vo against Sun.

The late D. Curtis "Dan" Danielson, Esquire, who entered an appearance on that first day of the TRO hearing, tried in vain to point this flaw out.  At page 12 of the transcript he says: "…there are many events including who has the possessory right to operate this particular gas station."  The TRO judge then says: "But I understand that the

action involves an alleged wrongful eviction in which Mr. Hemenway participated according to the allegations in the complaint." Danielson responds: "That's right, but there was no possessory right to be there."

In a nutshell, we see in this exchange what happened in this case. Since Dan Danielson vainly tried to get to the issue of the impropriety of Vo's alleged transfer of the franchise heeded, which would have led inevitably to the ruling of preclusion on ownership of the franchise which these plaintiffs now seek to enforce, and since the TRO judge gratuitously inserted the issue of "wrongful eviction," the litigation in the Superior Court has been a 20 year course of trying to cover up for this departure from the normal judicial role by the TRO judge, the Honorable Annice Wagner.

There was no issue of wrongful eviction in the Superior Court litigation in question. There was no count of wrongful eviction in the Vo complaint. Vo had attempted in an illegal manner to purchase a major oil company franchise for the ludicrous figure of one dollar. By statutory law he was forbidden even to sue Sun. The allegations and theories he set out in his complaint were of such common law torts as "conversion." In fact, on the subsequent day his counsel began his argument on "conversion." But none of this mattered to Judge Wagner; she began from the beginning to insert the issue of "wrongful eviction" into the case in order to assist Vo and Vo's counsel regardless of anything these plaintiffs, as defendants in that matter, might say or do. Thus she departed from the role of judge and became an advocate for one of the parties, a party who turned out to be a con artist and thug.

This was clear error and it worked a manifest injustice. It was accentuated by the refusal of the TRO judge to pay any attention to the attempts by counsel for these

defendants, and John D. Hemenway to point out that some questionable tactical tricks were being employed.  For example, clearly the court records showed that the counsel for Vo had blocked out the time for the TRO the day before, the day that Vo ostensibly "settled" his dispute with Hoai over the ownership of the franchise by the decision of the late Ernest Peele, as Sun Area Representative, on the tarmac after the confrontation at the station between Hoai and David Hemenway and a weapons-bearing gang with which Vo sought to reoccupy the premises.  The police were there and, after the supposed settlement, the attorney Arif purported to be taking inventory for purposes of the settlement.  Yet even as that ruse went forward Vo was consulting with Jones, Day attorneys to prepare the flawed complaint and violate the ban of the Retail Service Station Act by suing Sun and these present plaintiffs.  Yet the Jones, Day attorneys only notified John D. Hemenway a scant few hours before the TRO hearing that the hearing for which they had arranged the day before was going to be held. See page 22 of the transcript, Attachment A

Judge Wagner made it clear from the outset that she was not going to be bothered with such things as contracts and controlling law.  She made it immediately clear that she was going to shoehorn into the case a cause of action on behalf of Vo that was not contained in Vo's own complaint.  She elected to depart from the role of jurist, side with Vo as an advocate for him on a theory that had no factual foundation nor warrant in the law, namely that the question of the legality of the contract purporting to transfer the franchise was not at issue, but rather the question of a putative landlord-tenant relationship between Vo, whose franchise it was not, and Sun, whom Vo was barred by law from suing for the wrongs he claimed against Sun.

When one reads the transcript of the TRO proceedings on August 28 and 29 of 1986 it is completely apparent that the TRO judge is completely oblivious to the controlling law and resistant to any attempt to reach it.  Further, she allows Vo and his counsel to engage in substantial misrepresentation and even trickery in order to persist in assisting Vo rather than considering any actual controlling law.  She begins from the outset by resisting any attempt to get to the purported transfer of the franchise by the "One Dollar Contract."  The first 12 pages of the transcript are taken up with another tactical maneuver by the attorneys for Vo, that of naming John D. Hemenway as a defendant in order to prevent him from representing his client.  But, in her very first pronouncement from the bench on a subject other than the disqualification of John D. Hemenway, Judge Wagner says: "But I understand that the action involves an alleged wrongful eviction in which Mr. Hemenway participated according to the allegations in the complaint."  As we have pointed out, the original complaint did not allege the tort of wrongful eviction.  It alleges common law conversion and other related counts in which Vo asserted ownership of the franchise (As we have also pointed out these allegations, were inconsistent with the documentation attached to and incorporated in the complaint and with controlling statutory authority.)  The complaint made out plainly a dispute over ownership of the franchise between two parties who were co-equal in terms of their position in any landlord-tenant dispute, not a case of a paramount holder of a real estate seeking to evict someone.  Moreover, the case made out in the complaint, although the complaint conspicuously avoided mentioning any of the controlling statutory authority concerning service station franchises, was one where the statutory authority of both federal and local law preempts landlord-tenant law.  When, on page 12 of the transcript,

Danielson says: "…but there was no possessory right to be there," speaking of Vo, he is cut off.  Judge Wagner showed no interest whatsoever in getting to the actual issues of the case, only an interest in the issue that she gratuitously inserted into the case — wrongful eviction.

Her blindness in this regard is illustrated dramatically in the opening controversy that takes up the first 12 pages of the transcript.  Those pages are taken up with the maneuver by which the Jones, Day attorneys deprived Hoai of his counsel, John D. Hemenway.  As Danielson vainly pointed out, the key issue in the case, even under the allegations of the complaint of Vo which ignored the controlling law, was the validity of the "One Dollar Contract."  John D. Hemenway had no involvement whatsoever in the "negotiation" (consisting of threats to harm and even kill Hoai and his family) of the One Dollar Contract, in its drafting or formation.  He was not a necessary witness to the key events surrounding that essential element in the validity of Vo's case.  In fact he was not a witness at all.  In vain did Dan Danielson and John D. Hemenway point this out repeatedly.  Judge Wagner would have none of it.  Her focus was intense and that focus was solely upon inserting into the case on Vo's behalf the completely inapplicable issue of wrongful eviction.  And on that inapplicable issue she based her TRO just as she had decided she would do from almost the moment the TRO hearing began.

For 20 years now every attempt in the defendant courts, in motion after motion, pleading after pleading, by the present plaintiffs to have this clear error corrected and undo the manifest injustice it set in motion in the Superior Court has either been rebuffed without addressing the controlling law or simply ignored.  For example, early on in the Superior Court litigation it was removed to this Court because these plaintiffs, as

defendants in that case, mistakenly believed, as it turned out, that Vo was not yet a U.S. citizen, thus creating diversity sufficient to enable diversity jurisdiction. The litigation was remanded back to the Superior Court. But while it was in this Court the present plaintiffs filed a Rule 12(b)(6) dismissal motion in which they invoked both the enabling provisions of the PMPA at 15 U.S.C. § 2806(b) and the clear language of the Franchise Agreement as incorporated by Vo in his complaint which make it clear that Vo's claim to possessory rights are without merit, and also the District of Columbia Retail Service Station Act (RSSA) which make the meritless nature of Vo's complaint even more clear, including the absolute ban on Vo's suing Sun. After the remand back to the Superior Court this Rule 12(b)(6) dismissal motion was ignored by the defendant Superior Court for over 6 months, as the defendant Superior Court has ignored almost everything which seeks to get its judges to apply the controlling authority and law. So, on December 22, 1987, these plaintiffs renewed their Rule 12(b)(6) dismissal motion. Attachment D. eventually taken up and came before the Honorable Frederick P. Weisberg of the Superior Court, who denied it. Attachment E We call this Court's attention to page 3 of the Memorandum issued as that denial where Judge Weisberg states that these plaintiffs' claim under the PMPA "appears to be based on an incorrect reading of the Act,…" Subsequent events have demonstrated that that opinion by Judge Weisberg is clear error. More astonishingly, Judge Weisberg claims that the PMPA is overcome by the RSSA, an assertion which, as we have shown, is the opposite of what is the case. Even more astonishingly, Judge Weisberg then holds that resolution of these questions about the application of the PMPA and the RSSA must await discovery. As we have shown, the complaint of Vo with its incorporated attachments violates the provisions of the Sun

Franchise which the PMPA enables on its face and clearly and even more strongly violates the RSSA. So this was basically a judge failing to comprehend and apply the controlling law.

But Judge Weisberg did not stop with failing to actually address the controlling law, he went on the attack against these plaintiffs and threatened them for daring to seek to assert the controlling law. At page 5 of his memorandum of denial he asserted:

> In this court's view, if any party should be sanctioned, it is the defendants, not plaintiff. Defendants have made a relatively simple case unnecessarily complicated; and by their filing of voluminous motions, many of which are patently frivolous, and most of which are replete with inappropriate and *ad hominem* attacks against plaintiff and others, defendants have diverted this case off the Civil II calendar, where it belongs, requiring special assignment of a single judge for all purposes. The court will refrain from imposing sanctions against counsel or any party at this time, with the hope – and it is a faint hope at that – that reason and good judgment will prevail, and this case will now get back on a normal track through discovery to trial. The court admonishes all counsel and parties, however, that any discovery abuses will be dealt with summarily and harshly, and substantial sanctions will imposed against any party or counsel found to have abused the process or to have conducted himself unprofessionally.

So there you have it, these plaintiffs, and their counsel, are not only unlikely to get a full and fair hearing on their claims of preclusion, unless this Court sends a clear message that it will not assume that these plaintiffs will get a full and fair treatment of their claims on preclusion, the improper attack upon these plaintiffs, and their counsel, for pressing their claims is likely to resume. The above language has been used repeatedly by Sun counsel ever since. It did not work in the federal courts but it seems to have contributed to the manner in which Judge Dixon took away Hoai's rights to pursue his separate and pending claims against Sun. Twenty years of the elevation of judicial "collegiality" above the Rule of Law is enough. It is time to signal that it should stop.

Respectfully submitted,

   /s/

_____
Laurence A. Elgin #159582
Suite 900, South Building
601 Pennsylvania Avenue, NW
Washington, D. C. 20004-3615
TEL:   (202) 628-1114
FAX:   (202) 628-6798