Replaces Temp Cl.                                                    *EXHIBIT #1*

SUN 420 - I - T.F.

Date: March 27, 1986
Duns No: 0004-4180-14
Division: 750

# DEALER TRIAL FRANCHISE

## PART I

## COVER PROVISIONS

THIS TRIAL FRANCHISE is made and executed by the herein named Company and Dealer for purposes of stating the terms and conditions by which Company will make available for sale, Company's branded motor fuels to Dealer, and Dealer will operate Dealer's business, including the resale of Company's branded motor fuels to the public, at the Premises described below. This Trial Franchise constitutes a "trial franchise" as that term is used in and defined by Title 1 of the Federal Petroleum Marketing Practices Act, 15 U.S.C. §2801, et seq., hereinafter referred to as "the Act".

**COMPANY:** SUN REFINING AND MARKETING COMPANY

**COMPANY'S ADDRESS:** 1801 Market Street
Philadelphia, PA 19103

**DEALER:** THANH VONG HOAI

**PREMISES' ADDRESS:** 2305 Pennsylvania Avenue, S.E.
Washington, D.C. 20020

**TYPE OF MOTOR FUEL FRANCHISE:** RETAIL GASOLINE SALES: Full and Self Service
BUILDING USE: Conventional 3-Bay Service
Canopy and Kiosk

**TERM:**
THE TERM OF THIS TRIAL FRANCHISE IS ONE YEAR, BEGINNING ON April 10, 19 86, AND ENDING March 31, 1987. COMPANY MAY ELECT NOT TO RENEW THIS TRIAL FRANCHISE AS OF THE DATE LAST ABOVE STATED BY PROVIDING DEALER WITH WRITTEN NOTICE IN ACCORDANCE WITH THE PROVISIONS OF SECTION 104 OF THE ACT. THE PROVISIONS OF SECTION 102 OF THE ACT, LIMITING THE RIGHT OF COMPANY TO FAIL TO RENEW A FRANCHISE RELATIONSHIP, ARE NOT APPLICABLE TO THIS TRIAL FRANCHISE. IN ADDITION, COMPANY MAY TERMINATE THIS RELATIONSHIP PRIOR TO THE DATE LAST ABOVE STATED IN THE EVENT OF A VIOLATION OR BREACH OF THIS TRIAL FRANCHISE RELATIONSHIP, OR OF THE TERMS AND CONDITIONS CONTAINED IN THIS TRIAL FRANCHISE, OR FOR ANY REASON ALLOWED BY SAID ACT.

**RENT:**
Dealer shall pay to Company rent for said Premises, in monthly installments in accordance with the following schedule:
For the period April 10 1986 through March 31, 1987, Four Thousand Five Hundred Eighty Five Dollars ($4,585.00) per month. April 9, 1987

Each monthly installment is due and payable in advance, without demand or notice, on or before the fifth (5th) day of the month. Rent shall be prorated on a daily basis for periods of less than one (1) month.

**HOURS AND DAYS OF OPERATION:**
Dealer will operate Dealer's business and the Premises in the manner required by this Trial Franchise during the following hours per day and days per week:
24 hours a day/7 days a week
_____ to _____ Weekdays/Saturdays    _____ to _____ Holidays
_____ to _____ Sundays

PLAINTIFF EXHIBIT

**COMPANY'S EQUIPMENT:**
For use by Dealer in promoting and selling Company's branded motor fuels, Company loans to Dealer, for the term of this Trial Franchise, the following equipment which is or will be installed on said Premises by Company:
3 - Single Retros Leaded, 6 Retros Blended, 2 - Single Retros, Diesel, 2 - Sunoco Diamond
1 - Set Sunoco Letters                                         Signs & Poles

UNDERLYING LEASE:   NOT APPLICABLE
Company's right to grant possession of the Premises to Dealer is subject to an underlying lease which contains an initial term of _____ (_____) years, from _____ to _____ with _____ (_____) (_____) year renewal options, which lease might expire or nonrenew at the expiration of the initial term or any renewal option thereof.

PERSONAL SUPERVISION:
This Trial Franchise is made on the condition and understanding that ____Thanh Vong Hoai____ will personally manage the daily operation of Dealer's business. Prior written consent of Company is required in the event the above named individual desires to cease personal management of Dealer's business. Said consent of Company shall not be unreasonably withheld.

COLLATERAL DEPOSIT:
Terms and conditions governing collateral deposits listed below are set forth in Part IV Collateral Deposit Provisions.

Federal Identification or Social Security No.: __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__
State Code No.: __16__

Cash Portion of Deposit Only: __Five Thousand ---------------__ Dollars ($__5,000.00__)

Plus an additional amount to be accumulated from time to time at the rate of __one-half__ (__½¢__) cents per gallon on all deliveries of motor fuel until a total of __Twenty Five Thousand ---------__ Dollars ($__25,000.00__) has been accumulated.

Other agreed arrangements for accumulation of cash deposit:   None

Collateral Other Than Cash:   None

CREDIT CARD IMPRINTER:
Dealer acknowledges receipt of __Two__ (__2__) Credit Card Imprinter and Mount Box unit(s) and agrees to pay Company in advance a rental at an annual rate of __Forty__ Dollars ($__40.00__) per unit, effective the first day of the month following installation and extending to the next June 30th. Subsequent annual rental charges will date from July 1st for each succeeding year. Installation and maintenance costs of said units shall be paid by Company.

Dealer agrees not to remove said unit(s) from the Premises where installed, and to pay Company __One Hundred Thirty Two__ Dollars ($__132.00__) per unit in the event said unit(s) are lost or destroyed. Dealer agrees to return said unit(s) to Company upon request and hereby gives Company the right to remove the same at any time without notice and, in either event, Company shall refund any unearned prepaid rental.

Company reserves the right at all times to change the foregoing rental upon giving Dealer thirty (30) days' prior written notice.

PARTS OF DEALER TRIAL FRANCHISE:

Part I Cover Provisions
Part II General Provisions
Part III Lease Provisions
Part IV Collateral Deposit Provisions

Part V Credit Card Acceptance Provisions
Part VI Maintenance Provisions
Part VII Daily Recordkeeping and Inventory Control Provisions

The Provisions above constitute Parts of this Trial Franchise, and are incorporated therein and made a part thereof for all purposes.

NOTE TO DEALER: This is a binding legal document containing several Parts. You should carefully read each Part before signing in the space provided below.

EXECUTED the _____ (_____) day of _____, 19__.

WITNESSES: _[signature]_                    DEALER: _[signature]_
                                                    THANH VONG HOAI

_____                _____

_____                _____

_____                _____

                                            COMPANY:

                                            BY: _____
                                            Title: __DIVISION SALES MANAGER__

# DEALER FRANCHISE
# PART II
# GENERAL PROVISIONS

1. **PREMISES AND EQUIPMENT**

   a. Dealer, being in possession and control of the Premises and Equipment, shall keep the same in good order and condition at all times, and shall notify Company of any need for repairs of Company's Premises and Equipment in accordance with Part VI Maintenance Provisions. Notification by Dealer to Company of a need for repair, and the assumption by Company of repair shall not relieve Dealer of liability to Dealer's employees, invitees, customers and the general public for loss, injury and damage arising because of a state of disrepair to the Premises or Equipment.

   b. Company shall have ingress and egress to the Premises exercisable at any time, and from time to time, for purpose of inspecting the Premises and Equipment. This right of inspection includes, but is not limited to, reading meters and gauging tanks, taking samples of motor fuels, and examining systems associated with the storing and dispensing of motor fuels, and to adjust, exchange, remove, discontinue use of, repair or add to any of Company's Premises and Equipment, including Company's brand identification, as Company may deem necessary or desirable. All of the foregoing shall, be without liability to Dealer, Dealer's employees and representatives, for any loss or damage, except only for loss or damage solely caused by Company's negligence occurring in the course of such activity.

   c. Dealer shall strictly comply with Part VII Daily Recordkeeping and Inventory Control Provisions relating to underground storage of motor fuels.

   d. Dealer shall strictly comply with Part III Lease Provisions.

2. **PRICES**

   Dealer agrees to pay Company's Dealer prices in effect at the time and place of delivery for motor fuels and other products purchased by Dealer from Company. Company reserves the right at any time, and from time to time, to change its prices and to change the method of calculating such prices and values for products covered hereunder.

3. **TERMS OF PAYMENT**

   a. Dealer shall pay cash at the time of delivery for all products purchased by Dealer from Company, unless Company, at its option, establishes credit terms for Dealer.

   b. All credit terms and methods of payment shall be deemed a part of this Dealer Franchise, and may be amended or terminated at any time and from time to time by Company, upon notification thereof to Dealer. Company may suspend deliveries of products to Dealer in the event Dealer does not comply with credit terms and methods of payment determined by Company. The right to amend and terminate credit terms and methods of payment and suspend deliveries of products to Dealer shall be in addition to, and not in substitution for, other rights and remedies available to Company.

   c. Company shall make diligent efforts to invoice accurately, to provide an account statement, and to correct errors when discovered. In the event an overbilling occurs, Company will promptly credit Dealer's account, and if an underbilling occurs, Dealer shall pay Company such additional amounts upon receipt of corrected invoices or statements of account.

   d. All unpaid accounts owing to Company by Dealer shall bear interest from the due date until paid at rates established by Company or by law. Also, checks or drafts returned unpaid by Dealer's bank for any reason shall be assessed and Dealer shall pay a returned check charge at rates established by Company.

   e. Dealer shall provide Company, at Dealer's expense, with financial statements and other information relative to Dealer's credit standing, when requested from time to time by Company. Dealer represents that such information is prepared in accordance with generally accepted accounting principles and practices, consistently applied, fairly and accurately reflects Dealer's financial position, and may be relied upon by Company in doing business with, and in extending credit to, Dealer.

4. **RIGHT OF OFFSET; SECURITY INTEREST**

   a. Dealer grants Company the right, in the event Dealer fails to pay any and all sums owed to Company when due, to offset and apply sums held by Company and owing to Dealer. This offset right and application of funds shall be in addition to, and not in substitution for, other rights and remedies available to Company by law and other provisions of this Dealer Franchise.

   b. To secure the payment of accounts owing by Dealer to Company, Dealer shall deposit with Company cash, stocks, bonds or other things of value acceptable to Company, in amounts determined by Company, pursuant to Part IV Collateral Deposit Provisions. Company, at its sole discretion, may require Dealer, from time to time, to execute and deliver financing statements, security agreements or other documents.

5. **USE OF COMPANY NAMES; INDEPENDENT DEALER RELATIONSHIP**

   a. Dealer, as an independent businessperson, shall operate Dealer's business under Dealer's name, which shall be prominently displayed at the Premises together with the words "independent franchise dealer". Use of Company's brand identification as hereinafter defined and credit card system in connection with Dealer's business shall be limited to advertising to Dealer's customers that Dealer offers for sale Company's branded motor fuels and accepts Company's credit cards. Company's brand identification is not licensed by this Dealer Franchise to Dealer. Dealer shall not employ Company's brand identification as a part of a corporate or partnership name. Dealer's use of Company's brand identification and credit card system shall cease immediately upon termination or nonrenewal of this Dealer Franchise. Dealer does not, and shall not have any claim, right, ownership or other proprietary interest in Company's brand identification and credit card system.

©Copyright 1981 Sun Refining And Marketing Company

b. Dealer is not an employee, agent or representative of Company, and does not have the authority to act in any such capacity on behalf of Company. Any action or representation on behalf of Dealer to the contrary shall constitute fraud.

c. Dealer is solely responsible for the hiring, discharge, compensation, management, control and work rules of all personnel used or employed by or on behalf of Dealer in connection with said business.

d. Dealer is solely responsible for the quality of service performed for Dealer's customers, including the operation of, and service and repairs to, motor vehicles.

e. Dealer is solely responsible for proper handling and satisfactory resolution of claims and complaints by Dealer's customers respecting services performed by Dealer and Dealer's personnel.

f. Dealer is solely responsible for determining, establishing and posting of the retail prices at which Dealer provides services and sells motor fuels and other products to the motoring public.

6. OPERATION OF DEALER'S BUSINESS AND PREMISES

a. The essence and purpose of this Dealer Franchise is the purchase, the best efforts to promote, and the resale to the motoring public of, Company's branded motor fuels, by Dealer through the continuous operation of Dealer's business in accordance with this Dealer Franchise.

b. Dealer shall continuously operate Dealer's business at the Premises in the manner and to the degree expected by the motoring public of first class branded motor fuel outlets. In this respect, and in addition to other requirements contained in this Franchise, Dealer shall:

(1) Keep the Premises open and fully operating during regular business hours and days of the week; provided, however, if Part I Cover Provisions, or any amendments and ratifications thereto, of this Dealer Franchise specifies Hours and Days of Operation, then Dealer shall strictly comply with same, during the term of this Dealer Franchise.

(2) Keep the Premises in a clean, attractive, safe and healthful condition, free of ice, snow, dangerous conditions, and wrecked, junked and unlicensed vehicles. All driveways and islands shall be open and passable to the motoring public for business during Dealer's business hours. All restrooms, offices and other public facilities at the Premises shall be kept clean, attractive, and in good operating condition. Grease and other such substances, trash, debris, discarded tires and parts shall not be allowed to accumulate on or about the Premises, except in appropriate and properly maintained containers, and shall be periodically removed from the Premises by means of sanitation removal or other such services. All advertising signs and point-of-sale material shall be maintained in good condition and visible to the motoring public.

(3) Provide the motoring public with those levels of automotive services and motor fuel sales normally associated with the Type of Motor Fuel Franchise as specified in Part I Cover Provisions.

(4) Perform no repair, adjustment, oil change or chassis lubrication to motor vehicles on the Premises except when the Premises are designed for such activities and such activities are allowed by this Dealer Franchise.

(5) Not engage in heavy automotive repairs on the Premises, such as engine and body work normally associated with a garage, unless otherwise agreed in writing by Company.

(6) Not engage in the sale, storage or renting of motor vehicles, trailers or any type of equipment on the Premises, unless otherwise agreed in writing by Company.

(7) Keep all animals and weapons, which Dealer chooses to keep on the Premises, out of and away from those areas of the Premises used by the general public during business hours. Dealer accepts full responsibility and liability for such animals and weapons. Company does not condone Dealer's keeping such animals and weapons.

(8) Employ, train and manage a sufficient number of qualified personnel as appropriate to the Type of Motor Fuel Franchise as specified in Part I Cover Provisions, during regular business hours and days of week or as specified in Hours and Days of Operation in Part I Cover Provisions. Dealer shall establish all necessary and appropriate work rules and standards for Dealer's employees consistent with and as required by applicable law.

(9) Treat the motoring public in a friendly, courteous and professional manner. Develop and maintain the motoring public's respect for Dealer's business and for Company's branded motor fuels.

(10) Operate Dealer's business, including the use of the Premises, the operation of motor vehicles and all equipment, whether by Dealer personally, or by Dealer's employees, in a reasonable and prudent manner, taking due care to avoid any acts or omissions which might cause loss, injury, death or damage, or which might detract from the brand identification and reputation of Company.

c. Dealer's business shall be personally managed by the individual provided for in Part I Cover Provisions of this Dealer Franchise, if applicable.

7. MAINTENANCE OF MOTOR FUEL QUALITY AND BRAND

a. Dealer must maintain and continue to dispense to the motoring public a representative amount of Company's branded motor fuels through dispensing pumps bearing Company's brand identification.

(1) The term "representative amount" means a sufficient amount of each grade and type of motor fuel offered to Dealer by Company so that Dealer shall always have each grade and type available for resale and shall continue to sell Company's branded motor fuels through dispensing pumps bearing Company's brand identification, provided that Dealer is not required to have such motor fuels available for resale when they are not so offered by Company to Dealer.

2

(2) The term "Company's branded motor fuels" means motor fuels manufactured or supplied by Company and delivered to Dealer's Premises for purposes of resale to the motoring public through dispensing pumps bearing Company's brand identification. Company shall be the sole determiner of specifications, grades, types and sources of Company's branded motor fuels.

(3) The term "Company's brand identification" means the source marks, trademarks, trade names, logos, emblems, dispensing pump designs and color combinations associated with Company's branded motor fuels.

b. Dealer may dispense motor fuels from Dealer's place of business other than Company's branded motor fuels under the following conditions:

(1) Dealer must maintain and continue to dispense a representative amount of Company's branded motor fuels for resale to the motoring public.

(2) Motor fuels dispensed from pumps bearing Company's brand identification shall be Company's branded motor fuels.

(3) Dealer may not remove, alter or debrand Company's brand identification.

(4) In storing and dispensing motor fuels which are not Company's branded motor fuels, Dealer may employ existing underground tanks and lines, provided that non-Company motor fuels must at all times be segregated from Company's branded motor fuels.

(5) When Dealer intends to dispense non-Company motor fuels, and to do so necessitates the removal of dispensing pumps belonging to Company, Dealer must give Company reasonable advance notice in writing to enable Company to remove its branded dispensing pumps. Such removal shall be performed by Company at its expense within a reasonable period of time following receipt of appropriate notice from Dealer as above required.

(6) Dealer shall supply, install and maintain dispensing pumps used for dispensing motor fuels other than Company's branded motor fuels, and shall maintain the underground tanks and lines used for such purpose at Dealer's expense.

(7) Company has the right to reasonably restrict the size and location of any signs displayed at the leased Premises which advertise the sale of non-Company motor fuels and to require that Dealer adequately display signs to indicate clearly that such motor fuels are other than Company's branded motor fuels. Company shall not have any responsibility to comply with applicable statutes and regulations governing the sale, certification, grade and price posting for motor fuels dispensed by Dealer which are not Company's branded motor fuels.

(8) Company shall be indemnified and held harmless by Dealer against all claims of any kind for injury or loss resulting from or arising out of Dealer's handling, storage, dispensing and sale of any non-Company motor fuels at Dealer's Premises.

(9) Dealer shall not accept or honor Company's credit cards for the purchase of motor fuels other than Company's branded motor fuels.

(10) Company has the right upon written notice in accordance with and consistent with applicable statutes or regulations, to terminate the contracts of Dealer if Dealer fails to observe and comply with the foregoing conditions, including the definitions set forth above. The foregoing right of termination shall not exclude, impair or limit any other right Company may have to terminate or nonrenew its contracts and relationship with Dealer consistent with applicable law.

c. Company reserves the right, exercisable as and when Company may determine, to alter (which includes the right to add to, reduce, discontinue, modify, or otherwise change, as Company from time to time may determine and implement) the number, quality, grade, type, composition, color and specifications of Company's branded motor fuels, to alter Dealer's dispensing and storage equipment used in connection with Company's branded motor fuels, and to alter or withdraw Dealer's right to use Company's brand identification, all without liability to Dealer for losses and damages resulting therefrom, excepting only losses and damages occasioned by Company's negligence.

8. DELIVERIES

a. The Premises are the delivery point for all products sold by Company to Dealer. Company, however, reserves the right to change the point of delivery, upon 30 days' written notice to Dealer. Company is not required to deliver less than 100% of capacity of truck used for delivery of motor fuels to Dealer. Company may impose and Dealer shall pay handling charges as determined by Company for deliveries of less than 100% of capacity of truck and for deliveries made at Dealer's request which are not in accordance with Company's normal delivery practices. Company shall determine the method to be used to measure the quantity of motor fuel delivered to Dealer, and may change such method from time to time. Title and risk of loss of products shall pass from Company to Dealer at the point and time of delivery.

b. Dealer grants Company the right to deliver Company's branded motor fuels during the hours after which Dealer's business is closed. Dealer accepts Company's records as to the quantity so delivered with the reservation, however, that any claims for discrepancies on such deliveries must be made to Company immediately upon opening Dealer's business following the date delivery was made.

9. UNCONTROLLABLE EVENTS/ALLOCATION

Company and Dealer shall be forgiven their respective obligations hereunder to the extent that performance is delayed or prevented by causes reasonably beyond the control of either party, except any accounts owed by either party to the other. Company may allocate products among Dealer and other customers in the event it determines that any curtailment, shortage, or unavailability of products for any reason whatsoever exists and shall not be obligated to make up shortages resulting therefrom, nor shall Company be liable to Dealer for loss of sales, profits or business by reason of such allocation.

10. COMPLIANCE WITH LAWS

a. Dealer shall be solely responsible for compliance with all federal, state and local laws, regulations, ordinances and official orders relevant to Dealer's use of the Premises and the operation of Dealer's business. Dealer's responsibility includes, but is not hereby limited to: obtaining and main-

3

taining appropriate business licenses; reporting and paying when due all taxes associated with Dealer's business; compliance with laws dealing with posting of signs, notices and disclosures at the Premises; compliance with laws governing the maintenance, cleanliness and safety of the Premises (including the equipment and improvements on the Premises); compliance with laws relating to the hiring, compensation and discharge of persons employed in connection with Dealer's business; and compliance with laws regulating the receiving, storing, pricing and selling of motor fuels and other products at the Premises.

b. Dealer shall be solely responsible for retaining and disposing of all hazardous waste and used petroleum products and other substances, in strict compliance with applicable law. Company may, from time to time, when necessary or desirable to do so, establish procedures and standards for the handling and disposition of such waste, products and substances, and Dealer shall fully comply with the same upon receipt of notice thereof from Company to Dealer.

c. Dealer shall be solely responsible for strict compliance with all laws and regulations applicable to Dealer relative to the storage and dispensing of unleaded motor fuels at the Premises. In addition, Dealer shall comply, when applicable, with the rules and regulations of the Federal Environmental Protection Agency issued on January 10, 1973, as amended, and as promulgated under authority of the Clean Air Act of 1970, as amended, which rules and regulations are for the control and/or prohibition of certain fuels and additives for use in motor vehicles and motor vehicle engines. Subject to all other provisions of this Dealer Franchise, Dealer shall:

(1) Offer for sale from the Premises at least one grade of unleaded motor fuel.

(2) Not permit commingling of any leaded and unleaded motor fuel which is to be sold as unleaded motor fuel.

(3) Not knowingly accept, store, sell, dispense, or offer for sale through dispensing and/or storage equipment which is installed at the Premises for purposes of dispensing unleaded motor fuel, a motor fuel product which contains more than 0.05 (five one-hundredths) gram of lead per gallon, and/or more than 0.005 (five one-thousandths) gram of phosphorus per gallon.

(4) Prominently and conspicuously display and maintain in the immediate area of each motor fuel pump island, readily visible to Dealer's employees and customers, the following notice:

"Federal law prohibits the introduction of any gasoline containing lead or phosphorus into any motor vehicle labeled 'Unleaded Gasoline Only'."

(5) Affix and maintain on each motor fuel pump a permanent, legible label, readily visible to Dealer's employees and customers, containing one of the following notices, whichever is appropriate:

(a) For motor fuel pumps used for introduction of unleaded motor fuel into motor vehicles, the label shall state: "Unleaded Gasoline".

(b) For motor fuel pumps used for introduction of leaded motor fuel into motor vehicles, the label shall state: "Contains Lead Antiknock Compounds".

(6) Make certain that:

(a) Each motor fuel pump dispensing leaded motor fuel is equipped with a nozzle spout having a terminal end with an outside diameter of not less than 0.930 inch (2.362 centimeters);

(b) Each motor fuel pump dispensing unleaded motor fuel is equipped with a nozzle spout which meets the following specifications:

(1) the outside diameter of the terminal end shall not be greater than 0.840 inch (2.134 centimeters);

(2) the terminal end shall have a straight section of at least 2.5 inches (6.34 centimeters) in length;

(3) the retaining spring shall terminate 3.0 inches (7.6 centimeters) from the terminal end.

(7) Provide instructions to Dealer's personnel and Dealer's customers on the correct handling of related dispensing equipment, to ensure no contamination of unleaded motor fuel.

(8) Not allow employees, agents or customers to introduce, cause or allow the introduction of leaded motor fuel into any motor vehicle labeled "Unleaded Gasoline Only", or which is equipped with a motor fuel tank filler outlet which is designed for the introduction of unleaded motor fuel.

(9) Insure compliance with Company's standards of color coding for product fills.

(10) Permit Company to padlock any unleaded motor fuel pump(s) on the Premises in the event Company inadvertently delivers leaded motor fuel into the unleaded storage tanks; in such event, Company shall immediately remove the misplaced product from the unleaded motor fuel system, at Company's expense, and Company shall not be liable to Dealer for any loss of profit Dealer may suffer by reason of such removal, or the padlocking of the unleaded motor fuel pump(s), in the event of contamination of the unleaded motor fuel system.

(11) Immediately notify Company if Dealer knows, or has reason to know, that unleaded motor fuel pump(s) and storage tank(s) have been contaminated with leaded motor fuel, and shall immediately padlock, or permit Company to padlock, the unleaded motor fuel pump(s) to prevent dispensing of contaminated products. Company shall then be permitted to test and sample said product, and shall have the right to remove the contaminated product from the unleaded motor fuel system.

(12) Permit Company, during normal business hours, to inspect Dealer's books, records, equipment and facilities used in connection with the purchase, sale or handling of unleaded motor fuel when Company has cause to believe an unleaded motor fuel violation has occurred.

(13) Comply with the provisions and requirements of any Company program designed further to ensure Dealer and/or Company compliance with the aforesaid rules and regulations.

d. Unleaded motor fuel sold by Company to Dealer shall comply in all respects with applicable federal requirements and regulations at time and place of delivery by Company to Dealer.

4

## 11. INDEMNIFICATION

a. Dealer shall protect, indemnify, and save harmless Company of and from all claims, losses and damages for injury to the person and property (including death) of Dealer, Dealer's employees, customers, invitees, and other persons caused by or resulting in any way from:

   (1) Operation of Dealer's business, including but not limited to, the operation, service and repair of motor vehicles by Dealer, Dealer's employees, customers, invitees, agents and contractors;

   (2) Operation, use, condition and state of repair of the Equipment (including motor vehicles), and Premises (including driveways, walkways, signs, pumps, storage tanks, buildings, fixtures and improvements).

   (3) Loss, discharge and spill of petroleum products on or from Dealer's Premises (excluding loss, discharge or spill caused by Company or its carriers occurring during course of delivering motor fuels to the Premises);

   (4) Contamination, mixing, and dispensing of petroleum products by Dealer, Dealer's employees, customers and suppliers (excluding the Company and its contractors).

   (5) Claims and demands of Dealer's employees, agents and contractors for compensation, wages, benefits and other remuneration, including fines, interest and penalties assessed by appropriate governmental authority in any way associated with such remuneration, its payment or nonpayment;

   (6) Claims and demands of governmental taxing authorities, including taxes, fines, interest and penalties, associated with payment, nonpayment, reporting or nonreporting of taxes and assessments owed by Dealer or Dealer's business;

   (7) Acts and omissions of Dealer, Dealer's employees, contractors, and customers, whereby Company's licenses, or permits are or could be nonrenewed or terminated by governmental authority or whereby the underlying lease to the Premises, if any, would be breached.

b. Dealer shall further indemnify and reimburse Company for:

   (1) Costs, expenses and fees (including court costs and attorneys' fees) incurred by Company relating to litigation undertaken by Company against Dealer to successfully enforce, terminate or nonrenew this Dealer Franchise, or to collect money or recover property due by Dealer to Company.

   (2) Costs, expenses, fees (including court costs, attorneys' fees and costs of litigation), taxes, fines, penalties and judgments incurred or paid by Company by reason of a violation of law by Dealer.

c. All amounts due Company by Dealer by reason of indemnities and obligations imposed upon Dealer by this Dealer Franchise shall become due and payable by Dealer to Company upon demand as a part of Dealer's account to Company.

d. Dealer shall not be liable to Company, and does not protect, indemnify or save harmless Company or any other person for claims, losses and damages caused by or arising solely out of the negligence of Company, its employees and contractors.

## 12. INSURANCE

a. To adequately protect both Dealer and Company against legal actions by customers, employees and members of the public generally, Dealer shall purchase and maintain at Dealer's expense, the following insurance coverage:

   (1) Workmen's Compensation and Occupational Disease Insurance including Employer's Liability Insurance complying with the State in which this Dealer Franchise is to be performed or elsewhere as may be required. Employer's Liability Insurance shall be provided with a limit of not less than $500,000. If Dealer is not subject to requirements of state Workmen's Compensation Occupational Disease Laws, Dealer shall purchase voluntary Compensation Coverage to protect his employees.

   (2) Comprehensive General Public Liability Insurance, including coverage for products and completed operations work, and Contractual Liability Insurance covering the indemnity clauses in this Dealer Franchise, with minimum limits of:

   $500,000 — Bodily Injury and Property Damage, combined single limit.

   (3) Garagekeepers' Legal Liability:
   $50,000
   ~~$500,000 — Bodily Injury and~~ Property Damage, combined single limit.

   (4) Automobile Liability Insurance:

   $500,000 — Bodily Injury and Property Damage, combined single limit.

b. A certificate or other appropriate evidence of insurance coverage as above required, including a provision holding the Company harmless, shall be provided by Dealer to Company. It shall be Dealer's responsibility to keep said insurance coverage in full force and effect during the term of this Dealer Franchise. Such certificate of insurance shall provide that ten (10) days' advance written notice shall be given to Company in the event of any change in, or cancellation of, such insurance.

## 13. TAXES, FEES, LICENSES AND PERMITS

Dealer is solely responsible for all taxes, fees, licenses and permits required in connection with Dealer's business and Equipment used by Dealer, including permits, fees and certifications for dispensing pumps. Dealer shall pay or remit for payment all taxes imposed on bills of lading, invoices, and delivery tickets for products purchased hereunder which are not included in Company's prices, unless Dealer furnishes Company with a legal exemption certificate with shipping instructions.

## 14. MULTIPLE DEALERS

If more than one person is named as Dealer herein, any one of them shall be deemed to have the authority to bind all named Dealers with respect to all aspects of the franchise relationship, including the negotiation of the terms of subsequent franchise agreements, giving or receiving of notices, signed reports, terminations, nonrenewals and receipts, and transfer of credit card sales slips. Acts of any one named Dealer shall conclusively be deemed the acts of all said Dealers, each of whom shall be jointly and severally liable hereunder to Company.

5

15. **NOTICES**

   Any notices required by, or otherwise given in connection with, this Dealer Franchise shall be in writing and signed by the party giving such notice. Any notice directed to Company shall be mailed or delivered to Company's address stated in Part 1 Cover Provisions, and notices directed to Dealer shall be mailed or delivered to Dealer at the Premises.

16. **NON-WAIVER**

   Should either Company or Dealer at any time waive or fail to enforce any provision of this Dealer Franchise (including all parts, amendments and ratifications and addendum thereto), such waiver or failure to enforce shall not be construed as a waiver or relinquishment of that party's right thereafter to enforce any such provision.

17. **ENFORCEMENT; APPLICABLE LAW; RENEWAL, NONRENEWAL AND TERMINATION OF THIS DEALER FRANCHISE**

   a. Company has the right to enforce and require specific performance of all provisions of this Dealer Franchise including, but not limited to, Company's right to seek injunctive relief or any other rights or remedies available to Company.

   b. This Dealer Franchise is subject to and governed by the Act, which is made part of this Dealer Franchise for purposes of expressing the grounds upon which it may be terminated and nonrenewed by Company. The Company's right to terminate or nonrenew under the Act shall be in addition to, and not in extinguishment of, all other rights and remedies provided in favor of Company by applicable law and this Dealer Franchise. Therefore, should Dealer fail to substantially comply with, or violate, any requirement imposed upon, or promise made by Dealer in this Dealer Franchise, Company may nonrenew or terminate this Dealer Franchise.

   c. Prior to the end of the term of this Dealer Franchise, Company may determine to renew and continue its franchise relationship with Dealer on the basis of proposed changes and additions to the provisions hereof (including, but not limited to, changes in the rates and amounts of rent to be paid by Dealer for the Premises), and shall advise Dealer of same. All such changes and additions proposed by Company shall be the result of determinations made by Company in good faith and in the normal course of business. Should Dealer and Company fail to agree upon such changes and additions, Company shall have the right, upon notice to Dealer, to nonrenew this Dealer Franchise and the franchise relationship with Dealer as of the end of the term stated in Part 1 Cover Provisions. Should Dealer and Company agree upon such changes and additions, then Company agrees to renew this Dealer Franchise and continue the franchise relationship with Dealer, subject to and in accordance with the agreed changes and additions and the execution by both parties of a renewal Dealer Franchise.

   d. In the event Company should violate any substantive provision of this Dealer Franchise and not promptly correct same, Dealer may terminate this Dealer Franchise with Company at any time upon 90 days' prior written notice to Company. Said written notice must specify the particular reason or reasons which give rise to such termination in order to be effective.

   e. Upon the effective date of the termination or nonrenewal hereof,

   (1) All unpaid accounts owed by Dealer to Company, shall be due and payable in full, and shall bear interest from such date until paid at the rates established by Company's credit terms with Dealer;

   (2) Dealer shall cease the use of Company's brand identification and credit card system, and shall forthwith return the same to Company, together with all of Company's loaned Equipment, in good order and condition, at Dealer's expense;

   (3) Company shall repurchase from Dealer all Company branded motor fuels at Dealer's cost therefor; the amount thereof to be paid to Dealer or applied to Dealer's unpaid account with Company, as determined by Company.

18. **SURVIVORSHIP**

   a. In the event of death or incapacity of Dealer (for more than three (3) months, preventing, or likely to prevent, Dealer from continuing the active operation of the business and Premises throughout the remaining term of this Dealer Franchise in the same manner and to the same extent as existed prior to such event), this Dealer Franchise and the franchise relationship between Company and Dealer will continue in effect, provided that Dealer, or Dealer's legal representative, promptly make arrangements on behalf of Dealer satisfactory to Company, to continue the operation of the franchise business in the same manner and to the same extent as existed prior to such event.

   b. For purposes of the foregoing, the term "Dealer's legal representative" means a guardian, executor or administrator appointed by a court. Where there is no such appointed legal representative, and Dealer is deceased or otherwise unable to act on Dealer's own behalf, then for purposes hereof the term means Dealer's spouse or other relative(s) acting on behalf of Dealer or Dealer's estate; provided, however, that Company shall have the right to determine and be satisfied with respect to the authority of any person or persons so acting on behalf of Dealer's estate; provided, further, that in appropriate circumstances Company, on its own, may institute legal proceedings for purposes of having a guardian or administrator appointed to represent Dealer's estate.

19. **SALE AND ASSIGNMENT**

   a. Subject to the following provisions, Dealer may make a sale of Dealer's business:

   (1) For purposes hereof, a "sale of Dealer's business" includes: (a) any reorganization of Dealer's business, such as incorporation or the formation of a partnership or other business entity subsequent to the date of this Dealer Franchise whereby another person, not previously a party hereto, acquires rights with respect to Dealer's business or its operation; (b) any transfer or assignment of an interest in Dealer's business or any part thereof or an assignment or subletting in whole or in part of the Premises to any person, firm or corporation not a signatory party hereto. The term "Dealer's business" includes purchasing and reselling of Company's branded motor fuels and the use and possession of the Premises. A change in the marital status of Dealer, if an individual, and granting of a lien or security interest in Dealer's business for financing purposes, shall not constitute a sale of Dealer's business.

(2) At least sixty (60) days' prior to the effective date of a sale of Dealer's business, Dealer shall notify Company in writing of such sale. The notice to Company shall include the name and the current address of the purchaser(s), together with the purchase price, if any, and all other essential terms and conditions of the sale. Copies of all documents (including the proposed sale contract) that will be used in connection with the sale shall also be provided to Company. Dealer represents to Company that all information supplied to Company with respect to a sale of Dealer's business is true and correct.

(3) Upon receipt of Dealer's notice given pursuant to preceding paragraph, Company shall thereafter have at least sixty (60) days' time to conduct an examination of the purchaser's credit standing, financial condition, business suitability to function as a franchisee of Company and to evaluate the proposed sale of Dealer's business. In this respect, Dealer and purchaser(s) shall provide Company with all information as Company requests for purposes of making its examination. Dealer shall bear the cost of the examination of the purchaser's credit standing. Such examination, and any disapproval or conditioned approval made by Company, shall be in accordance with, and based upon, reasonable and objective business practices and standards. Company shall not be held liable for any losses caused Dealer by such disapproval or conditioned approval.

(4) If, in Company's opinion, based upon objective and accepted business practices, such person does not have sufficient credit standing or business experience to function as a dealer in the manner required by this Dealer Franchise, then Company shall notify Dealer in writing of its opinion and may refuse to permit the contemplated sale of Dealer's business, or by such writing may condition its approval upon a revision of credit terms, upon execution by such party of a Trial Franchise (as that term is used in the Act) as a substitute for this Dealer Franchise and upon the attendance and successful completion by such party of Company's dealer training school.

(5) If, based upon Company's examination, such person acquiring an interest in Dealer's business does have sufficient credit standing and business experience to function as a dealer in the manner required by this Dealer Franchise, then Company shall approve the assignment without condition, except Company shall have the right to require such person to execute a Trial Franchise (as that term is used in the Act) as a substitute for this Dealer Franchise and to require such person to attend and successfully complete Company's dealer training school.

(6) Each actual or contemplated sale of Dealer's business, shall be made subject to the foregoing provisions of this Dealer Franchise. An assignment of this Dealer Franchise, whether or not made in the manner permitted by these provisions shall not alter or discharge Dealer's obligations hereunder to Company, except as agreed to beforehand in writing by Company, or when the sale of the Dealer's business is made to Company.

(7) Should Dealer complete a sale of Dealer's business in whole or in part and fail to notify Company as above required, or make a sale or assignment which has been disapproved by Company or fail to provide Company with complete information as requested by Company, such action or failure, as case may be, shall be treated for all purposes as fraud.

b. Company may assign this Dealer Franchise to any distributor, jobber, refiner or other "franchisor", as that word is used in the Act subject to the following:

(1) Assignee shall agree in writing with the Company to perform and comply with all of Company's obligations hereunder.

(2) Company shall notify Dealer in writing of the name and the address of assignee and the effective date of assignment.

(3) Such assignment when made in the manner above provided shall not be treated as either a termination or nonrenewal of this Dealer Franchise, or of any of Dealer's rights as a "franchisee" under the Act, but this Dealer Franchise and Dealer's rights shall continue in full force and effect. Assignee shall succeed to all of the rights and privileges provided in favor of Company under this Dealer Franchise and the Act.

20. REPRESENTATIONS OF DEALER

a. Dealer represents the following to Company:

(1) Dealer is entering into and signing this Dealer Franchise of Dealer's own free will and choice, and is not acting under influence of any threat or coercion by Company or its representatives.

(2) There have been no promises, claims or representations made to Dealer by Company or its representatives of any kind (including for purposes of illustration, promises concerning price, quality or quantity of products and services sold or supplied by Company, condition of, future repairs to, or replacements of, Equipment or Premises, or present or future market conditions and competitive activities) which are not contained in this Dealer Franchise or in another written document signed by, or furnished to Dealer by, Company as a part of the franchise relationship.

(3) Dealer has employed, or has had sufficient opportunity to employ, legal counsel for the purposes of examining and explaining this Dealer Franchise to Dealer.

(4) Dealer has carefully read and examined this Dealer Franchise, has had sufficient opportunity to do so, and understands Dealer's obligations and responsibilities as a franchisee.

(5) Dealer is signing this Dealer Franchise for purposes of operating a first class branded motor fuel outlet and purchasing from Company and reselling to the motoring public Company's branded motor fuels.

(6) Dealer has no intention or plan, at the time of signing of this Dealer Franchise, to transfer or assign this Dealer Franchise or Dealer's business.

(7) There are no other persons who have any interest in Dealer's business, or who will act in the capacity of a Dealer hereunder, who are not named herein as a Dealer, except as disclosed in writing to Company.

(8) Dealer has, or will promptly obtain, training and education sufficient to operate Dealer's business in accordance with the standards and practices normally expected of first class branded motor fuel operators.

(9) Dealer has, and will maintain, sufficient capital and financing to operate Dealer's business.

b. Company, in entering into, signing and performing this Dealer Franchise is relying upon the foregoing representations of Dealer, which representations shall be continuing and shall survive the term of this Dealer Franchise.

21. MISCELLANEOUS

a. All prior contracts and understandings between the parties concerning the purchase and sale of motor fuels are cancelled as of the date the term of this Dealer Franchise commences, and Dealer and Company are fully released from all liabilities, claims and responsibilities arising out of such prior agreements, except with respect to any unpaid accounts owed by either party to the other and claims for indemnity of Company by Dealer under Section 11 of this Dealer Franchise. This Dealer Franchise, when executed by both Company and Dealer, shall be binding upon the parties, their respective heirs, executors, administrators, successors and assigns.

b. In the event any law is passed, or should a court decision or decree be issued, which in the opinion of Company, may make any part of this Dealer Franchise (including any addendum, amendment and ratification) legally defective, or ineffectual or have the effect of deeming the same or similar agreement, term or provision to be void or illegal, then Company may, at its sole discretion, upon notice to Dealer, amend, add to, or delete such part, term or provision, or replace this entire Dealer Franchise, for purposes of correcting such defect, ineffectual, void or illegal part, term, provision or agreement, and Dealer shall accept the same for such purposes.

c. Nothwithstanding the giving of a notice of termination or nonrenewal hereof, Company may, in its sole discretion and without waiving such notice or Company's rights thereunder, elect to extend and temporarily continue in effect the Dealer Franchise beyond the effective date of such notice. Company's extension hereof shall not be effective or binding unless made in writing and signed by Company, and shall state therein the period of time of the extension and such other terms and conditions which Company deems appropriate relating to such extension.

d. This Dealer Franchise including any documents incorporated herein contains the entire agreement between Company and Dealer with respect to Dealer's operation of business at the Premises designated in Part I Cover Provisions. No modification of this Dealer Franchise shall be binding on Company unless in writing and signed by its authorized representative.

# DEALER FRANCHISE

## PART III

## LEASE PROVISIONS

Company hereby leases to Dealer and Dealer hereby accepts and leases from Company the Premises referenced in Part I Cover Provisions of this Dealer Franchise, for the Term therein stated. The Premises include, and this Lease covers, buildings, improvements, driveways, sidewalks, easements and underground motor fuel storage facilities on and about the Premises.

1. Rent:

a. The rent for the Premises is specified in Part I Cover Provisions.

b. Past due rent shall bear interest at rates established by Company's credit terms with Dealer. Also, checks or drafts for rent returned unpaid by Dealer's bank for any reason shall be assessed and Dealer shall pay a returned check charge at rates established by Company.

c. If the Premises are rendered unusable for the Type of Motor Fuel Franchise as specified in Part I Cover Provisions, by fire or other casualty, or if public work or repairs on or about the Premises, or improvements or modifications to the Premises by Company, prevent access to the Premises or otherwise substantially interfere with the use of the Premises by Dealer, then Company may, at its sole discretion, abate the rent or any part thereof, until such condition is ended. Dealer, upon written notice to Company, may terminate this Dealer Franchise if the abatement of rent is not acceptable to Dealer. Abatement of rent, as determined by Company, shall be the exclusive and entire liability of Company to Dealer because of such condition.

2. Use and Maintenance of Premises:

a. The Premises are to be used for the operation of Dealer's business. Dealer shall keep and maintain the Premises in good order and condition, in the manner described in Part II General Provisions of this Dealer Franchise, in accordance with Part VI Maintenance Provisions and applicable law.

b. Dealer shall not make any additions or alterations to the improvements, nor erect or add any buildings or other enclosure on the Premises without Company's prior written permission; provided, this provision is not intended to prevent Dealer from making additions and alterations to the Premises for the purposes of storage, sale and dispensing of Dealer's motor fuels. Additions and alterations made to the Premises by Dealer shall be at Dealer's own risk and expense, and shall be performed in a good and workmanlike manner, and in accordance with Company's engineering standards. At the end of this Lease, the Premises shall be restored to their original condition at Dealer's expense, normal wear and tear excepted; provided, that Company may in writing waive all or any part of this requirement, and may permit Dealer's additions and alterations, or any part thereof, to remain upon the Premises. In the latter event, such additions and alterations shall become the property of Company.

8

3. Underlying Lease:

   a. In the event Company's right to grant possession of the Premises to Dealer is subject to an underlying lease, as specifed in Part I Cover Provisions, Dealer is hereby notified, and does hereby recognize, as of the beginning date of this Dealer Franchise, that such underlying lease may expire and may not be renewed during the term of this Dealer Franchise, or at the end thereof. Company is not obligated to Dealer to renew or renegotiate any underlying lease of the Premises, nor to otherwise keep Dealer in possession after the expiration of such lease.

   b. Dealer shall not knowingly engage in any business or activity upon the Premises whereby the underlying lease would be breached or could be terminated by the landowner.

4. Service Charges and Utilities:

   Dealer shall directly pay service charges, fees and costs of telephone, water, gas, electricity, heat, sewer, rubbish and snow removal, and other such services and utilities delivered to or used on the Premises. In the event Company pays for any of the above, Dealer shall reimburse Company for the same upon demand.

5. Condemnation:

   a. Should the Premises, in whole or in part, be condemned or otherwise taken pursuant to power of eminent domain, Company may terminate this Dealer Franchise at any time thereafter upon notice to Dealer.

   b. Dealer shall have no claim to any portion of a condemnation award payable to Company with respect to the Premises; provided, however, Dealer shall be entitled to act independently in legal proceedings respecting such condemnation and shall be entitled to recover and retain any award payable to Dealer for loss of business opportunity or good will.

6. Warranty of Title:

   Company makes no warranty of leasehold or title to the Premises or any part thereof, except that as of the beginning date of this Dealer Franchise, Company is unaware of any defect in title to the Premises which would prevent Company from granting possession to Dealer.

7. Surrender of Premises:

   a. This Lease and Dealer's use and possession of the Premises (including all assignments and subletting by Dealer) shall end as of the effective date of the termination, nonrenewal or cancellation of this Dealer Franchise, whereupon Dealer shall immediately surrender, quit and return possession of the Premises to Company. Notice and demand to quit and for possession and re-entry by Company are waived.

   b. Should Dealer fail to surrender, quit and return possession of the Premises to Company at the end of this Lease, Company shall have the right to enter upon the Premises and evict Dealer therefrom for purposes of repossessing the same without having liability to Dealer for trespass or damage by reason of such re-entry and eviction.

   c. In addition to Company's right of re-entry and eviction, Company may detain, distrain and take possession of all property belonging to Dealer and others found on the Premises for unpaid rent, and may sell or otherwise dispose of such property in accordance with applicable law, without liability to Dealer by reason of such action. Subject to the foregoing, Dealer shall remove all of Dealer's personal property from the Premises at end of this Lease, and any property left or found upon the Premises ten (10) days after Dealer has been requested to remove the same, may be removed, stored or disposed of by Company without liability to Dealer for the value, loss or damage thereto occasioned by such removal storage or disposition. Costs incurred by Company for removal, storage and disposition of Dealer's property so left or found upon the Premises shall be borne by Dealer and paid to Company.

   d. Notwithstanding the foregoing, and without waiving any of its rights to evict Dealer and re-enter the Premises, which rights shall be continuing and remain in full force and effect from and after the end of this Lease, if Dealer remains in possession of the Premises for whatever reason other than by virtue of a separate agreement in writing signed by Company, then Company may elect to treat Dealer as a tenant at will of the Premises, subject to the further right to terminate such tenancy upon thirty (30) days' prior written notice to Dealer, and Dealer shall be obligated to pay to Company, and Company shall be entitled to collect from Dealer, rental for said tenancy equal to one hundred fifty (150%) percent of the final monthly installment of rent stated in Part I Cover Provisions, or any amendment and ratification thereto, of this Dealer Franchise for each thirty (30) days or part thereof of said tenancy at will. Acceptance by Company of rent for said tenancy at will, and Company's decision, failure or delay in evicting Dealer and re-entering the Premises at the end of this Lease shall not be treated or construed as a renewal of this Dealer Franchise (or this Lease) which renewal cannot be made except by written agreement for that purpose signed by Company.

# DEALER FRANCHISE

## PART IV

## COLLATERAL DEPOSIT PROVISIONS

1. Dealer has undertaken and intends to undertake certain and varied financial obligations to Company, whereby Dealer will become indebted to Company from time to time for or on account of rents for the use of Premises and Equipment leased from Company, motor fuels, petroleum products, automotive accessories and/or equipment sold by Company to Dealer.

2. In order to secure the prompt and full payment of such indebtedness, Dealer has deposited with Company money and/or property, at or before the signing of this Dealer Franchise as listed in Part I Cover Provisions and is bound to make future deposits as listed in said Provisions.

    a. Dealer represents that all money and property deposited or to be deposited as listed in Part I Cover Provisions, is and/or shall be free and discharged of all claims, assignments, trusts and legal processes of any person not a party hereto.

    b. Dealer shall pay to Company any indebtedness or balance of indebtedness whatsoever, which Dealer owes to Company, by reason of any obligation now or hereafter undertaken by Dealer in favor of Company.

    c. Said money and/or property now deposited or to be deposited as listed in Part I Cover Provisions shall be held by Company as one general continuing collateral security for the discharge and payment of the whole or any part of any indebtedness or liability of Dealer to Company.

3. The kind of property and/or the amount of money deposited or the rate at which said money is to be deposited may be changed, substituted, reduced or increased at any time by mutual agreement of Company and Dealer.

4. Dealer hereby authorizes Company to apply the collateral security to the payment of any obligation, indebtedness, liability or tax outstanding of Dealer to Company or for which Company may become liable at any time during or at the end of the relationship with Dealer. This includes the right of Company to sell property, stocks, bonds, or any other securities of Dealer deposited and held by Company. Company shall have the right to purchase any or all of the property to be sold at either public or private sale, free from any right of redemption on the part of Dealer.

5. Company shall be the sole determiner of the disposition of said collateral security. Company's disposition of said collateral security shall not release Dealer of any obligations contained in this Dealer Franchise. Should Company use collateral security, Company may require changes in credit terms with Dealer.

6. Company shall pay Dealer at time periods determined by Company, interest on the amount of the net cash security not exceeding the sum of $25,000, deposited with and held by Company at rate to be determined by Company from time to time, reduced by the amount of any tax payable by Company with respect to said net cash security; and any dividends, interest or other payments received by Company on stocks, bonds or any other securities of Dealer deposited and held by Company. Such dividends, interest, or other payments shall be less taxes or other charges, if any, which shall be payable by Company with respect to said property.

7. Upon the end of this Dealer Franchise, including the payment of all indebtedness and liabilities due or payable to Company by Dealer, Company agrees to return to Dealer any property and money on deposit or the unapplied balance thereof, unless a new Dealer Franchise is signed by both parties.

KEY TO ABBREVIATIONS USED TO DESCRIBE "COLLATERAL
OTHER THAN CASH" IN PART I COVER PROVISIONS

Shs — Shares
Com — Common
Pfd — Preferred
Stk — Stock
Ctf — Certificate
Mtg — Mortgage

Ch M — Chattel Mortgage
D T — Deed of Trust
B S — Bill of Sale
Assgmt - Assignment
1st — First
2nd — Second

Sec Agr — Security Agreement
C S A — Conditional Sales Agreement
Pro Note — Promissory Note
Cog Note — Cognovit Note
Judge Note — Judgment Note
No. — Number

# DEALER FRANCHISE

## PART V

## CREDIT CARD ACCEPTANCE PROVISIONS

1. CREDIT CARD SALES: Dealer is hereby authorized to honor Company credit cards and such bank, travel, entertainment and other credit cards as may, from time to time, be offered by or through Company, for purposes of making retail credit sales to Dealer's customers for products sold and services performed by Dealer, as Dealer may determine. Company shall, as provided in these Provisions, serve as an assignee of such credit card sales, with recourse against Dealer.

2. ACCEPTANCE OF CREDIT SALES TICKETS: Company agrees to accept, for collection purposes, credit sales tickets for products sold and services performed in conjunction with the operation by Dealer of the Type of Motor Fuel Franchise as provided in Part 1 Cover Provisions, subject to the following conditions:

   a. All credit card sales must be made in compliance with written credit instructions supplied by or through Company, and Dealer acknowledges receipt of said instructions.

   b. Company may, from time to time, amend said written credit instructions, and Dealer shall be bound by such amendments upon delivery of same to Dealer.

   c. Company may, from time to time, upon notice to Dealer, cease to accept one or more types of credit card sales tickets, or refuse to accept tickets from Dealer, without having liability to Dealer.

   d. Company may refuse to accept any sales ticket prepared using an imprinter that does not perform to the level required by Company.

   e. Dealer's personal credit card shall not be used for any purchase or other transaction at Dealer's business.

   f. Dealer further agrees to maintain copies of assignment forms 3811 and SX-16 for a period of not less than one (1) year from date of submission to Company. In case Company's Credit Card Center fails to receive submitted sales tickets, Dealer will be requested to provide these copies. Failure to provide copies will result in chargebacks for the tickets involved to Dealer. The existence of a signed receipt from Company to Dealer does not eliminate this responsibility to maintain copies.

   Upon assignment to Company of valid credit sales tickets in compliance with written credit instructions, Company shall pay Dealer the face amount thereof, less applicable discounts and charges then in effect, if any, as determined by Company. Company shall have the right to impose, eliminate and change amounts and rates of discounts and charges at any time, and from time to time, upon notice to Dealer. Company may, at its option, and in lieu of payment to Dealer, apply the face amount of credit sales tickets accepted by Company, less applicable discounts and charges, to Dealer's account with Company, for accounting convenience.

3. COLLECTION OF CREDIT SALES TICKETS: Upon acceptance by Company of credit sales tickets as above provided, Company may proceed to collect, or transfer for collection, from Dealer's customers, the face amount of such sales tickets, plus finance charges, as Company may elect to impose thereon.

4. REASSIGNMENT OF CREDIT SALES TICKETS: Company may, at any time, and from time to time, reassign credit sales tickets to Dealer in the event such tickets do not comply with written credit instructions, and the Company, or its transferee, does not fully collect the same from Dealer's customers. Upon return to Dealer of uncollected credit sales tickets, DEALER SHALL IMMEDIATELY PAY COMPANY THE UNCOLLECTED AMOUNT THEREOF, plus any expense, cost or fee incurred by Company in connection with said sales tickets, or Company may charge Dealer's account therefor.

5. REPRESENTATIONS AND INDEMNIFICATION: Dealer represents to Company and to its transferees that all credit sales tickets assigned to Company represent actual sales of products and services to Dealer's customers in the manner and to the extent set forth in said tickets. Dealer hereby exonerates, indemnifies and holds harmless Company, and its transferees, of and from all claims, demands and actions whatsoever, arising in connection with credit sales tickets assigned by Dealer to Company, including, but not limited to, claims, demands and actions brought by Dealer's customers for alleged losses and damages relating to the products sold and/or services performed by Dealer, and Dealer agrees to reimburse Company and its transferees, upon demand, for all costs, expenses, settlements, fines, judgments and attorneys' fees incurred by reason of such claims, demands and actions.

6. REMEDIES OF COMPANY: Company may suspend its acceptance of credit sales tickets in addition to all other rights provided by law and by this Dealer Franchise, without having liability to Dealer, when Company has reason to believe that written credit instructions are not being complied with by Dealer.

# DEALER FRANCHISE

## PART VI

## MAINTENANCE PROVISIONS

1. Dealer, being in possession and control of the Equipment and Premises, has the primary responsibility to keep and maintain the same in good order and condition at all times.

2. Dealer is responsible for informing Company in a timely manner of any Equipment failure, and of any need for repair or replacement of the Equipment or Premises as stated herein.

3. Notification by Dealer to Company of a need for repair, and the assumption by Company for repair shall not relieve Dealer of any liability incurred to third parties, including Dealer's employees, customers, invitees and the general public, because of a state of disrepair.

4. Dealer is responsible for providing full information to Company in the event of damage to Company's Equipment or Premises. Such information shall include the name(s) of person(s) involved, date, time, name(s) of witness(es), name(s) of insurance company(ies), and a description of the accident and damage.

5. Company reserves the right, following proper notification by Dealer, to determine whether a need for repair or replacement of the Equipment or Premises exists.

6. Dealer is responsible for repairing any damage to Company's Equipment or Premises caused by Dealer, Dealer's customers, employees, or other parties. When Dealer is responsible for repair or replacement, any damage to the Equipment or Premises not repaired or replaced to the satisfaction of Company, shall be repaired or replaced by Company or its agents, and shall be billed to, and paid by, Dealer.

7. Dealer is responsible for the installation and maintenance of all Dealer's equipment, whether owned or leased from a third party.

8. Company reserves the right, without liability to Dealer, to change these Maintenance Provisions at any time upon giving Dealer thirty (30) days' written notice of such change.

## DEALER MAINTENANCE RESPONSIBILITY FOR EQUIPMENT

| ITEM | DEALER RESPONSIBILITY |
|---|---|
| MOTOR FUEL DISPENSING PUMPS | Change prices at all pumps. Purchase and repair all nozzles. All government sealing charges. Repair or replace damage to pumps as a result of accidents, excepting loss or damage caused by Company's negligence. Clean and wax pumps regularly. Change filters as needed. Filters to be provided by Company. Notify Company of other needed repairs. |
| SELF SERVE CONSOLES | Clean and protect from abuse. Repair or replace due to negligence by Dealer, Dealer's customers, employees or agents and all damage due to vandalism. Notify Company of other needed repairs. |
| TRADEMARK SIGNS | Notify Company of needed repairs. |
| CREDIT CARD IMPRINTER(S) | Clean and protect from abuse. Call Credit Card Center, 1-800-331-3350, for repair or replacement. |
| AIR HOSES | Provide and maintain. |
| FIRE EXTINGUISHER(S) | Provide and maintain, according to local regulations. |

| ITEM | DEALER RESPONSIBILITY |
|---|---|
| LUBRICATION EQUIPMENT | Keep clean, including reel cabinets. Notify Company of needed repairs. |
| LIFTS | Keep area around piston clean. Lubricate piston once a month. If lift becomes defective and continued use is unsafe, discontinue use immediately. Notify Company of needed repairs. |
| ROOFS AND PARAPETS | Repairs required due to Dealer's action in affixing or storing any object to or on roof or parapets. Notify Company of other needed repairs. |
| PAINTING: | |
| — Building exterior, fences and interior | Touch-up as required to maintain Company's standard of appearance. Paint to be provided by Company. |
| — Poles (lights and signs) | Touch-up as required to maintain Company's standard of appearance. Paint to be provided by Company. |
| — Hoists and Curbs | Paint as required to maintain Company's standard of appearance. Paint to be provided by Company. |
| MISCELLANEOUS: | |
| — Keys | Replace lost keys. Retrieve keys from locked washrooms. Change of locks subsequent to taking station. |
| — Ice and Snow Removal | Keep sidewalks and driveways clear of ice and snow. |
| — Trash Removal | Remove all trash and waste, including auto parts, old tires, batteries, etc., on a minimum of a weekly basis. Junk cars are prohibited. Dispose of hazardous waste as prescribed by the Environmental Protection Act and the Resource Conservation Recovery Act. |
| — Lawn and Shrubbery | Mow lawns; trim shrubbery; remove weeds. Keep greenery consistent with Company's image program. |

14